Callie A. Bjurstrom, State Bar No. 137816
callie.bjurstrom@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone: 619.544.3107
Facsimile: 619.236.1995

Stephen A. Swedlow (pro hac vice forthcoming)
stephenswedlow@quinnemanuel.com
Michelle Schmit (pro hac vice forthcoming)
michelleschmit@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: 312.705.7400
Facsimile: 312.705.7401


[ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE]

Attorneys for Plaintiffs IQVIA INC. and IQVIA AG

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IQVIA INC., a Delaware corporation; and IQVIA AG, a Swiss company, <br><br> Plaintiffs, <br><br> vs. <br><br> MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation; and DALE BROWN, individually, <br><br> Defendants. | Case No. **'21 CV 2081 BEN AHG** <br><br> **PLAINTIFFS' COMPLAINT FOR (1) MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA, 18 U.S.C. § 1836; (2) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT; (3) RICO; (4) BREACH OF FIDUCIARY DUTY; AND (5) CIVIL CONSPIRACY** <br><br> **JURY TRIAL DEMANDED** <br><br> Judge: |

COMPLAINT

## COMPLAINT

IQVIA Inc. and IQVIA AG (collectively, "IQVIA" or "Plaintiffs"), by and through their counsel, for their Complaint against MedImpact Healthcare Systems, Inc. ("MedImpact U.S.") and Dale Brown (collectively, "Defendants"), hereby allege as follows:

## INTRODUCTION

1.     Beginning in 2011, Defendants, alongside MedImpact International LLC ("MedImpact International") and MedImpact International Hong Kong Ltd. ("MedImpact Hong Kong"), schemed to steal confidential and proprietary trade secrets from Dimensions Healthcare LLC ("Dimensions") through a "partnership" with Dimensions in the Middle East (the "Joint Venture" or "MedImpact Arabia").[1]  IQVIA AG acquired Dimensions—including its intellectual property—in February 2016. IQVIA AG is wholly-owned by IQVIA Inc.

2.     From the outset, Defendants targeted Dimensions as an ostensible "partner" for the express purpose of gaining access to Plaintiffs' trade secrets under the façade of the Joint Venture.  Defendants knew that by stealing those trade secrets, MedImpact U.S. would be able to build a better pharmacy benefits management ("PBM") platform[2] that would "leapfrog[]" MedImpact U.S.'s own PBM offering. Specifically, Defendants planned to build what they called a new ██████████ ████████████████████████████—by, among other things, unlawfully incorporating Plaintiffs' trade secrets into the existing MedImpact U.S. PBM platform.

---

[1]   The Joint Venture was entered into between MedImpact International (a wholly-owned subsidiary of MedImpact U.S.) and Dimensions on February 1, 2012.  On January 1, 2014, MedImpact International transferred its interest in the Joint Venture to MedImpact Hong Kong (also a wholly owned MedImpact U.S. subsidiary).  MedImpact U.S., MedImpact International, and MedImpact Hong Kong are referred to collectively herein as "MedImpact."

[2]   A PBM platform is a platform that allows patients to obtain insurance approvals for prescribed medicines through online, real-time insurance coverage approvals or denials for prescribed medicines, based upon clinical algorithms, plan design rules, and member eligibility.

1

The very purpose of the ▮▮▮▮▮▮ was to develop an offering that would be deployed worldwide, including by MedImpact U.S. in the United States.  In other words, by incorporating Plaintiffs' trade secrets into the MedImpact U.S. ▮▮▮▮▮ ▮▮▮ MedImpact would offer for sale and/or provide Plaintiffs' trade secrets all over the world.

3. At the center of Defendants' plot to exploit Plaintiffs' trade secrets were Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits.  Drug-to-diagnosis <u>indication</u> edits provide a rejection alert when a patient requests to fill a prescription for a medication that is not used to treat that patient's medical diagnosis.  For example, an indication edit would reject the incorrect prescription of an antibiotic—used to treat bacterial infections—for a viral infection, such as influenza.  Relatedly, drug-to-diagnosis <u>contraindication</u> edits provide a rejection alert when a patient requests to fill a prescription for a medication that may result in an adverse drug event if the medication is taken by a patient with certain medical conditions.

4. More specifically, Plaintiffs' drug-to-diagnosis indication and contraindication edits trade secrets are comprised of the custom logic and methods behind building and maintaining the logic that links between content and relational lists connecting drugs to diagnoses and conditions, including how an edit adjudicating engine works and the populated content within it, and validation of the edits.

5. MedImpact did not have the ability to offer such drug-to-diagnosis indication and contraindication edits before "partnering" with Dimensions.  Rather than invest the necessary resources, including time, talent, and money, to independently develop the requisite expertise to provide drug-to-diagnosis indication and contraindication edits, MedImpact decided to take a shortcut and steal the trade secrets instead.

2

6.     In an October 2011 presentation to the MedImpact U.S. Senior Leadership Team and Board, Defendant Dale Brown specifically identified the ████████████

████████████████████████████████████████ ██████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

7.     Unaware of Defendants' ulterior motives to misappropriate Plaintiffs' trade secrets, such trade secrets were transparently shared with MedImpact through the Joint Venture, including Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits trade secrets, subject to governing non-disclosure and confidentiality agreements.  Plaintiffs' closely held trade secret information was shared with MedImpact primarily via electronic means (*e.g.*, via email) as well as telephone calls and in person meetings.

8.     Defendants thereafter wrongfully exploited Plaintiffs' closely held trade secrets for MedImpact's own gain.  Defendants misused the "partnership" with Dimensions to gain access to the drug-to-diagnosis indication and contraindication edits trade secrets; engaged in years-long theft of those trade secrets; and exploited that theft by offering and/or providing these edits for sale in the United States, Australia, South Africa, Canada, Turkey, ████████████████████ (and very likely many other places, including, without limitation, China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom); all the while concealing the theft and misappropriation.

9.     Defendants' theft continued after IQVIA AG acquired Dimensions, including its drug-to-diagnosis indication and contraindication edits trade secrets, in 2016.  Both before and after the termination of the Joint Venture in 2017, Defendants

COMPLAINT

offered these trade secrets to clients and health agencies all over the world. Plaintiffs have every reason to believe this misappropriation is ongoing today.

10. Through their theft, Defendants bypassed years of research and development time, and avoided tens of millions of dollars in investment. At no point did Defendants disclose that they had been stealing Plaintiffs' trade secrets and offering them for sale in the United States, Australia, South Africa, Canada, Turkey, █████ ████████████████ among other locations. In fact, Defendants actively concealed these facts.

11. In addition, Defendant Dale Brown engaged in the unlawful conduct detailed herein while serving on the Board of and as General Manager of the Joint Venture. Brown, for his part, siphoned trade secrets from Plaintiffs, and turned around and offered such trade secrets for sale in the United States, Australia, South Africa, Canada, Turkey, ████████████████ Brown was a direct participant in the theft from and unlawful competition with Plaintiffs. Again, at no time did Brown disclose that MedImpact was pillaging Plaintiffs' trade secrets.

12. Plaintiffs seek damages for their injuries resulting from Defendants' unlawful conduct, and a permanent injunction enjoining Defendants from possessing, misappropriating and using Plaintiffs' trade secrets, among other relief.

## PARTIES

13. Plaintiff IQVIA Inc. is organized and existing under the laws of the State of Delaware with a principal place of business in Plymouth Meeting, Pennsylvania. IQVIA, directly and through various subsidiaries around the world, provides, among other things, market research, analytics, technology and services to the life sciences, medical device, and diagnostics and healthcare industries, to clients in over 100 countries. IQVIA's global reach allows IQVIA's life sciences clients to improve their understanding of, and interaction with, the global healthcare environment and, in turn, improve patient outcomes and save lives. Since its founding more than sixty years ago,

4

COMPLAINT

IQVIA has invested substantial sums to bring a wide range of innovative market research, analytics, technology and services offerings to the life sciences, medical device, and diagnostics and healthcare industries.  Through those years, clients have realized substantial benefits from their use of IQVIA offerings.  As a consequence, IQVIA grew from a small business operating in two countries to a multi-billion dollar business employing approximately 70,000 people and operating in more than 100 countries.

14.    Plaintiff IQVIA AG has its principal place of business in Switzerland.  IQVIA AG is wholly-owned by IQVIA Inc.  IQVIA AG is the controlling beneficial owner of Dimensions and has the exclusive power to control the operations of Dimensions.

15.    Non-Party Dimensions Healthcare LLC is incorporated in the United Arab Emirates.  Dimensions is a leading developer of healthcare informatics solutions, including software development, clinical decision support systems, design, data collection, integration, requirements and business analysis, reporting quality indicators, claims data review, healthcare analytics, medical coding, technical consultancy services, policy making, medical coding training and system training.  Dimensions' primary business is to assist private and public sectors to offer higher-quality healthcare services by collecting and processing information that is used to decrease inefficiencies and reduce wasteful expenditures.  Dimensions' solutions focus on improving clinical outcomes and increasing efficiency.  Dimensions combines healthcare services and information technology to provide solutions for healthcare providers, payers, and government regulators.

16.    Defendant MedImpact Healthcare Systems, Inc. (MedImpact U.S.) is a privately held California corporation with its principal place of business in San Diego, California.  MedImpact U.S. wholly owns its subsidiary MedImpact International LLC, and MedImpact International LLC in turn wholly owns its subsidiary MedImpact

International Hong Kong Ltd.  According to MedImpact, "[MedImpact Hong Kong's] revenue is predominantly from the [Joint Venture].  [MedImpact Hong Kong's] revenue is ultimately passed through [MedImpact International], and consolidated in [MedImpact U.S.'s] financial statements.  [MedImpact U.S.] has also invested revenue and San Diego-based resources, including, labor to support [MedImpact Hong Kong]." *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 93, ¶ 77.

17.     Defendant Dale Brown, an individual, and previously a Board Member and the General Manager of MedImpact Arabia at all relevant times herein, owed and breached his fiduciary obligations to Plaintiffs.  Brown is the former President of MedImpact U.S.; former President (and previously, Senior Vice President) of MedImpact International LLC; and, upon information and belief, was a resident of California at all relevant times herein, and remains a resident of California.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this dispute arises by virtue of Defendants' violations of 18 U.S.C. § 1836, *et seq*. and 18 U.S.C. § 1962(c), *et seq*.  This Court likewise has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     Defendants are subject to personal jurisdiction in this district, as MedImpact U.S. is a California corporation with its principal place of business in San Diego, California, and Dale Brown, upon information and belief, is and was at all relevant times herein a resident of California.  Further, Defendants' wrongful conduct was conducted within California, including at MedImpact U.S.'s headquarters in San Diego, California.

20.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendants reside in the District.

## BACKGROUND

**A.     Plaintiffs' Drug-to-Diagnosis Indication and Contraindication Edits Trade Secrets**

21.     Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits save patients' lives, by preventing patients from taking unnecessary medications or medications that may otherwise cause them harm.  As Defendant Dale Brown explained in an October 2014 article for Premium magazine: "Preventing contraindicated or unnecessary medications is better for patients and insurers.  Consuming unnecessary medications can potentially lead to patient sickness, preventable medical errors and ADEs [Adverse Drug Events], which are defined by the US Food and Drug Administration (FDA) as an event for a patient taking a drug when the outcome of taking that drug is life-threatening, requires hospitalisation [sic], creates disability and/or requires intervention to prevent permanent impairment or damages."

22.     As one of many examples, Plaintiffs' drug-to-diagnosis indication and contraindication edits have been critically important to preventing the over-prescription of and growing resistance to antibiotics.  As Brown detailed in the Premium article referenced above: "MedImpact Arabia identified that up to 37 percent of antibiotics being prescribed in the UAE may be clinically inappropriate … Unnecessary or incorrect antibiotic use places the entire UAE population at risk for bacterial infections that may become less treatable due to increasing resistance … Since its broad implementation in 2012, our proprietary systems for checking clinical appropriateness of antibiotic and anti-infective drugs has reduced the total number of antibiotic and anti-infective claims by 20 percent."

23.     Taken   together,   Plaintiffs'   drug-to-diagnosis   indication   and contraindication edits generate a substantial percentage of alerts and/or rejections, and are thus highly valuable to clients by minimizing errors, fraud, waste, and/or abuse of medications and driving savings.   As MedImpact has stated, Plaintiffs' drug-to-diagnosis indication and contraindication edits accounted for ███████████████ █████████████ in the UAE, rendering it one of the most valuable clinical edits available to clients.

24.     Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits, for thousands of medications, were developed over years (including well before the Joint Venture), through the dedicated work of numerous full time employees, including pharmaceutical experts.   This effort entailed collating and reviewing medical data from a large number of sources to populate a database, building the logic to run the indication and contraindication edits, and validating the edits.

25.     Plaintiffs undertake substantial efforts to protect their trade secrets, including   their   confidential   and   proprietary   drug-to-diagnosis   indication   and contraindication edits.  For example, Plaintiffs regularly use non-disclosure agreements and confidentiality agreements to protect information in the course of their business and to secure their intellectual property.  Plaintiffs further employ physical and technical restrictions to prevent the theft of their intellectual property, such as firewalls, private networks, password protections, and other technical mechanisms to ensure the security of their trade secrets.

**B.     Defendants Conspired to "Partner" with Dimensions to Gain Access to the Drug-to-Diagnosis Indication and Contraindication Trade Secrets**

26.     According to MedImpact, "[i]n or around 2010 to 2011, [MedImpact U.S.] was  interested  in  expanding  its  PBM  platform  globally."   *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 93, ¶ 30.  To do so, MedImpact U.S. "formed [MedImpact International] to expand its

PBM services in the international market," and "[i]n or around 2011, [MedImpact International] began discussions with Dimensions…"

27.    Months before MedImpact International and Dimensions even entered into the Joint Venture Agreement (in February 2012), Defendants began inquiring into drug-to-diagnosis indication and contraindication edits. ████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████

28.    ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████[3]

29.    ██████████████████████████████████████████
████████████████████████████████████████████████████████

_____

[3] Shortly thereafter ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████

COMPLAINT

30.   Just a few weeks later, ████████████████████████

31.   Less than two months later, ████████████████████

32.   As of 2011, Defendants thus knew that they could gain access to confidential and proprietary drug-to-diagnosis indication and contraindication edits—a capability that MedImpact U.S. did not have—by partnering with Dimensions, and could in turn exploit these trade secrets for the strategic benefit of MedImpact U.S.

33.   So, at the urging of MedImpact U.S., MedImpact International and Dimensions entered into the Joint Venture Agreement on February 1, 2012.

34.   It was through the Joint Venture that Defendants then gained access to the drug-to-diagnosis trade secrets.  Following execution of confidentiality agreements, Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis indication and contraindication edits, through numerous emails, teleconferences, and in-person meetings.

35.   In addition, over the term of the Joint Venture, MedImpact U.S. received and recorded the results of millions of combinations of the drug-to-diagnosis indication

COMPLAINT

and contraindication edits.  As a result, MedImpact U.S. acquired the confidential and proprietary logic and methods underlying the drug-to-diagnosis edits.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

**C.     Defendants Schemed to Build a PBM Platform Based on Plaintiffs' Trade Secrets**

36.    According to MedImpact, MedImpact U.S.'s "PBM platform is used to support MedImpact's … business in the United States and under license, is also currently used abroad by [MedImpact International] and [MedImpact Hong Kong]." *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 93, ¶ 14.  Defendants knew that incorporating Plaintiffs' trade secrets into MedImpact U.S.'s PBM platform would "leapfrog[]" the MedImpact U.S. platform forward, to the benefit of MedImpact U.S., MedImpact International, and MedImpact Hong Kong.

37.    In a March 2013 conference, Defendant Dale Brown said as much, representing to attendees that the Joint Venture's ████████████████████

████████████████████████████████████████████████████████████

Similarly, Dale Brown's LinkedIn Profile stated that "the first PBM in the United Arab Emirates … leapfrogg[ed] US based PBM platforms by leveraging latest technologies with an expanded portfolio of clinical algorithms."

38.    As MedImpact concedes, MedImpact's offering in the UAE was based on MedImpact U.S.'s platform under license to MedImpact International.  *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 93, ¶ 14.  It was therefore Plaintiffs' drug-to-diagnosis edits that leapfrogged the Joint Venture's PBM offering ahead of the MedImpact U.S. platform.

39.     Recognizing   this,   MedImpact   U.S.   developed   a   strategic   plan   to misappropriate  Plaintiffs'  trade  secrets,  with  the  intent  to  incorporate  them  into  the MedImpact U.S. platform, and then deploy the trade secrets around the world.

40.     More specifically, Defendants' plan was to develop a ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████

41.     To   accomplish   this,   MedImpact   needed   to   incorporate   the   drug-to-diagnosis  edits  into  its  U.S.  PBM  platform,  planning  to ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████

42.     But MedImpact U.S. wanted to avoid the need to invest the necessary time and  expense  to  develop  drug-to-diagnosis  edits.   Having  failed  to  develop  a  home-grown  capability  to  meet  customer  demand  and  regulatory  requirements  for  drug-to-diagnosis indication and contraindication edits, Defendants decided to simply steal the same.

43.     Following Dimensions' notice of termination of the Joint Venture in 2017, MedImpact,  including  Defendant  Dale  Brown, ████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████

44.  ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

45. MedImpact thereafter

46. As Defendant Dale Brown recounted

As Brown stated in the same internal email,

47. MedImpact has and is continuing to misappropriate Plaintiffs' drug-to-diagnosis edits trade secrets in connection with its MedBlocX offering. According to MedImpact, in an October 12, 2021 court filing, "Medblocx is a new product that will be used in the UAE … Medblocx is currently being beta tested by a handful of customers, but those customers do not have live production versions. A limited version, without a user interface, has been provided to three other customers." *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 345 at 6.

48. MedImpact built MedBlocX based on Plaintiffs' trade secrets.

COMPLAINT



(emphasis added).

49.

50.

51.    Hmeidan and Liu both reported to Defendant Dale Brown.

**D.    Defendants Offer Plaintiffs' Trade Secrets for Sale Across the World**

52.    Defendants have offered and/or provided Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits for sale in the United States, Australia, South Africa, Canada, Turkey,                                    (and very likely other locations, such as China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom).

53.    *First*, as it relates to Australia, Defendant Dale Brown, on behalf of MedImpact, responded to an Expression of Interest from the Australian government in

COMPLAINT

October 2014, relating to the provision of PBM services in Australia.  In MedImpact's response, submitted by Brown, ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████

54.    Of course, the PBM services offered by the Joint Venture in the UAE *incorporate* Plaintiffs' drug-to-diagnosis edits trade secrets.  Indeed, Brown, on behalf of MedImpact, expressly offered to provide the Australian government such confidential and proprietary drug-to-diagnosis edits, highlighting drug-to-diagnosis indication and contraindication edits as ██████████████████████████████ ██████████████████████.[4]

55.    In 2017, MedImpact *again offered* the confidential and proprietary drug-to-diagnosis edits to the Australian government, again with the direct involvement and participation of Defendant Dale Brown.

56.    *Second*, as it relates to South Africa, in November 2016 MedImpact entered into a partnership with Medical Services Organization ("MSO"), a company in South Africa, to offer PBM services there.  The MedImpact-MSO partnership was managed by Defendant Dale Brown, along with many of the same MedImpact employees responsible for the Joint Venture.

57.    MedImpact intended from the outset to provide drug-to-diagnosis indication and contraindication edits in South Africa, based on Plaintiffs' confidential and proprietary trade secrets.  For example, █████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████

---

[4] ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████

58. ███████████████████████████████████████

59. *Third*, MedImpact U.S. likewise appears to have incorporated Plaintiffs' drug-to-diagnosis indication and contraindication edits into MedImpact U.S.'s PBM platform.  For example, ███████████████████████████

60. In February 2018, Defendant Dale Brown advised the Board of the Joint Venture (including IQVIA employees) that ███████████████████████ On information and belief, the drug-to-diagnosis indication and contraindication edits in the MedImpact U.S. PBM offering were derived from Plaintiffs' confidential and proprietary information.

61. *Fourth*, as it relates to Canada, MedImpact U.S. prepared a response to a Request for Proposal from ███████████████████ with the assistance of Defendant Dale Brown and MedImpact's Dr. Queenie Liu.  MedImpact proposed a solution to ██████████████

COMPLAINT

1  ████████████████████████████  On information and belief, MedImpact

2  offered and/or provided for sale Plaintiffs' drug-to-diagnosis trade secrets ███████

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ████

6       62.   *Fifth*, in February 2018, Dr. Amar Mahmood, Medical Director and

7  Deputy Regional Manager of MedImpact International, contacted a private medical

8  insurer in Turkey ████████.  Mahmood followed up in May 2018, stating that

9  MedImpact was ████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  MedImpact specifically offered and/or provided for sale drug-to-diagnosis trade secrets,

13  which, based on information and belief, were misappropriated from Plaintiffs.

14       63.   Before then, in September 2016, MedImpact made a proposal to ███

15  ████████████████████████████████████████████████

16  ████████████████████████████—the trade secrets at issue here, and,

17  which based on information and belief, were misappropriated from Plaintiffs.

18       64.   *Sixth*, as it relates to █████████████████████

19  ████████████████████████████████████████████████

20  ████████████████

21       65.   *Seventh*, as it relates to ██████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████

24       66.   *Eighth*, as it relates to ███████████████████████

25  ████████████████████████████████████████████████

26  ███████████

27

28

67.     *Ninth*, MedImpact has additionally provided or offered to provide MedBlocX through the Joint Venture in the Middle East. ██████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████ As of November 2021, Dimensions is no longer a member of the Joint Venture, and MedImpact's use of Plaintiffs' trade secrets to provide or offer MedBlocX to current or prospective clients of the Joint Venture is unlawful.

68.     On information and belief, MedImpact, with the direct involvement of Defendant Dale Brown, has additionally taken steps to offer and/or provide its MedImpact U.S. PBM offering and/or MedBlocX—which, on information and belief, includes Plaintiffs' drug-to-diagnosis trade secrets—for sale in China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom, among other locations.

**E.      Defendants Conceal their Theft of Trade Secrets**

69.     At no time did Defendants ever disclose that they had used their "partnership" with Dimensions to gain access to Plaintiffs' trade secrets; that they had misappropriated those trade secrets; or that Defendants were offering drug-to-diagnosis indication or contraindication edits in the United States, Australia, South Africa, Canada, Turkey, ███████████████████ (or elsewhere) based on these trade secrets.    Instead, Defendants continually concealed, and otherwise deliberately misrepresented their misconduct.  For example:

a.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ At no time did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

b.  The drug-to-diagnosis indication and contraindication edits were regularly discussed at Pharmacy and Therapeutics ("P&T") meetings.  For example, the minutes of the first P&T meeting on April 24, 2012, attended by ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ as provided by Dimensions.   The drug-to-diagnosis indication and contraindication edits were further discussed, at minimum, during the following P&T meetings: May 23, 2012, attended by ███████████████ ██ ; July 4, 2012, attended by ██████████████████ ; October 10, 2012, attended by ████████████████████ February 13, 2013, attended by █████████ ██████████████████████ ; December 17, 2014, attended by ████████████████████ and July 1, 2015, attended by ████████████████ .  At no time

19

during the P&T meetings or otherwise did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets, or had misappropriated the drug-to-diagnosis trade secrets.

c.  IQVIA AG acquired Dimensions in February 2016.  Following the acquisition, MedImpact, Dimensions, and/or IQVIA engaged in numerous communications—via email, teleconference, and in person—over the course of years.  For example, ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ participated in Joint Venture Board meetings, including, without limitation:

  i.  April 29, 2016 Joint Venture Board meeting attended by ████ ████████████████████████████████████

  ii.  August 22, 2016 Joint Venture Board meeting attended by ████ ████████████████████████████████████ ██████

  iii.  October 26, 2016 Joint Venture Board meeting attended by ████ ████████████████████████████████████ ██████

  iv.  February 10, 2017 Joint Venture Board meeting attended by ████ ████████████████████████████████████

  v.  May 4, 2017 Joint Venture Board meeting attended by ████ ████████████████████████████████████ ██████ and

  vi.  September 12, 2017 Joint Venture Board meeting attended by ████████████████████████████████████████

1  ███████████████████████████████████████

2  ██████████████████████████████████

3     At no time during the Board meetings or otherwise did Defendants disclose

4     that they had misappropriated the drug-to-diagnosis trade secrets.

5  d.  ████████████████████████████████████

6  ███████████████████████████████████████████

7  ███████████████████████████████████████████

8  ███████████████████████████████████████████

9  ████████████████████        In requesting access to Plaintiffs' trade secrets,

10    Defendants did not disclose that they sought such access to misappropriate

11    the same.

12  e.  In February 2018, Defendant Dale Brown advised Amit Sadana (IQVIA),

13    Nitin Goel (IQVIA), Aravinda Tiwari (IQVIA), Yousef Ghosheh

14    (Dimensions), Dr. Omar Ghosheh (Dimensions), James Gollaher

15    (MedImpact U.S.), and Nancy Radtke (MedImpact U.S.), among others,

16    that ████████████████████████████████████

17  ███████████████████████████████████████████

18  █████████████████████████████████   At no time did

19    Defendants disclose that the drug-to-diagnosis edits in MedImpact U.S.'s

20    PBM offering were misappropriated from Defendants and offered for sale

21    to other clients.

22  f.  █████████████████████████████████████

23  ███████████████████████████████████████████

24  ███████████████████████████████████████████

25  ███████████████████████████████████████████

26  ███████████████████████████████████████████

27  ███████████████████████████████████████████

28

COMPLAINT

On August 14, 2019, Ghosheh provided sample indication and contraindication edits.

Both Guttikonda and Dr. Mahmood followed up to request the indication and contraindication edits from Ghosheh, on November 21, 2019 and November 30, 2019, respectively. Ghosheh provided the indication and contraindication edits on December 20, 2019. Plaintiffs provided these edits based on Defendants' *repeated* misrepresentations that they sought the information for the benefit of the Joint Venture's clients. Defendants did not state the true reason they sought the edits—to offer such trade secrets for sale to other clients.

70. Had Plaintiffs known Defendants' true intent, they would not have provided access to their trade secrets. Thus, but for Defendants' material misrepresentations and omissions, Defendants would not have gained access to Plaintiffs' trade secrets.

COMPLAINT

**F.      The Injury Caused by Defendants' Unlawful Conduct**

71.      As a direct and proximate result of Defendants' misconduct, Plaintiffs have been and continue to be injured.

72.      Defendants' unlawful use of Plaintiffs' trade secrets, including, without limitation, offering and/or providing Plaintiffs' trade secrets for sale to health authorities and/or clients in the United States, Australia, South Africa, Canada, Turkey, ███████████████████████ constitutes unlawful competition against Plaintiffs. Plaintiffs, acting through Dimensions, license their drug-to-diagnosis trade secrets to health authorities, to facilitate the monitoring and/or regulation of fraud, waste, and abuse of prescription medications.  Defendants' unlawful use, offers to sell and/or sale of Plaintiffs' trade secrets erodes the prices of Plaintiffs' own offerings (through Dimensions) of the drug-to-diagnosis indication and contraindication edits.

73.      Additionally, Defendants were required to obtain a license to Plaintiffs' drug-to-diagnosis indication and contraindication trade secrets, to use, offer for sale and/or sell such trade secrets, and Plaintiffs have been deprived of royalties from such license.

74.      Furthermore, the value of Plaintiffs' drug-to-diagnosis indication and contraindication edits trade secrets has been diluted by Defendants' misappropriation of those trade secrets and offers to provide those trade secrets around the world.

75.      Moreover, Plaintiffs have been deprived of the benefit of their years-long investment of time and money into the development of these trade secrets, which were stolen by Defendants.

76.      Plaintiffs have also been deprived of the benefit of the bargain of their acquisition of Dimensions—including the trade secrets—by Defendants' theft of these trade secrets.  Plaintiffs paid more than they otherwise would have to acquire Dimensions, including its intellectual property, had Plaintiffs known of Defendants'

theft of the drug-to-diagnosis indication and contraindication edits (which Defendants concealed).

77.  In addition, by stealing Plaintiffs' trade secrets and engaging in the unlawful conduct described herein, Defendants bypassed years of research and avoided development time and tens of millions of dollars of investment expense.  In doing so, Defendants caused tens of millions of dollars in damages to Plaintiffs.

## STATUTE OF LIMITATIONS

78.  On February 20, 2018, Dimensions diligently and timely filed counterclaims for breach of contract against MedImpact International and MedImpact Hong Kong in an Arbitration proceeding.  *MedImpact International LLC, et al. v. Dimensions Healthcare LLC, et al.*, DIFC-LCIA Arbitration No: DC18141 ("Arbitration").  Dimensions alleged that MedImpact International and MedImpact Hong Kong had breached the parties' Joint Venture Agreement and Service Level Agreement by using Dimensions' intellectual property, including ███████ ███████████████████████████████████████████

79.  Throughout the Arbitration—which commenced on January 23, 2018 and concluded on July 24, 2019—MedImpact and Defendant Dale Brown falsely and repeatedly denied that MedImpact had misused Dimensions' drug-to-diagnosis indication and contraindication edits.  For example:

    a.  In a January 3, 2019 sworn witness statement submitted in the Arbitration, Defendant Dale Brown stated that ███████████████████ ██████████████████████████████████ ████████████████ (emphasis added).  This sworn statement was false when made.  At the time this statement was made, ██████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████

3  b. In the same sworn statement, Brown stated that ████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  (emphasis added). This sworn statement was false when made. At the

9  time this statement was made, ████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████

12  c. In the same sworn statement, Brown stated, with respect to MedBlocX,

13  that ████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████

18  d. In their January 3, 2019 Reply and Defence to Dimensions' counterclaims

19  in the Arbitration, MedImpact International and MedImpact Hong Kong

20  ████████████████████████████████

21  ████████████████████ This denial was false when made, notably *after*

22  ████████████████████████████████████████████████

23  ████████████████████████████████

24  80.   In addition to making false statements in the Arbitration, MedImpact

25  concealed evidence of MedImpact's misuse of Plaintiffs' drug-to-diagnosis trade

26  secrets throughout the Arbitration. MedImpact refused to respond to document requests

27  relating to the drug-to-diagnosis edits in the Arbitration, successfully blocking

28

COMPLAINT

discovering into ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

81.    MedImpact additionally refused to provide sufficient access to Dimensions' expert in the Arbitration, to enable the expert to investigate Dimensions' counterclaim. As Dimensions' expert stated, █████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ Dimensions' expert further

stated that ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

82.    MedImpact and Brown fraudulently concealed their misuse of Plaintiffs' drug-to-diagnosis edits, by knowingly making false statements in the Arbitration, and concealing highly relevant evidence.   MedImpact and Brown intended to induce Dimensions to rely on their misrepresentations in an effort to escape liability in the Arbitration.   Justifiably relying on MedImpact's misrepresentations and as a direct result of MedImpact's cover-up in the Arbitration, ███████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

COMPLAINT

83.    Notwithstanding Dimensions' diligence in timely pursuing claims against MedImpact in the Arbitration, because of MedImpact's false statements and concealment in the Arbitration, Plaintiffs could not have discovered, through the exercise of reasonable diligence, the existence of the instances of misappropriation alleged herein until, at the earliest, the summer of 2021, in connection with discovery in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.).   With limited exception, no MedImpact documents were produced in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.* before May 17, 2021.  And over half of MedImpact's documents in that case were produced on or after August 6, 2021.

84.    Plaintiffs first learned of MedImpact's ███████████████████ █████████████████████████████████████████████ on August 6, 2021. ████████████████████████████████████████████████████████████████ ████████████████████████, and was produced for the first time on August 6, 2021, in connection with M*edImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.* Plaintiffs first learned that MedImpact was in turn offering MedBlocX—████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████   Given MedImpact's claim in an October 12, 2021 court filing that MedBlocX "is a **new product** that will be used in the UAE . . .," and ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████    Plaintiffs first learned that MedImpact had previously offered Plaintiffs' drug-to-diagnosis trade secrets for sale in the United States, Australia, South Africa, Canada, and Turkey, in the summer of 2021, when MedImpact first produced documents in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*

COMPLAINT

85.   Plaintiffs could not reasonably have ascertained these facts any earlier, notwithstanding Dimensions' due diligence in pursuing claims in the Arbitration, because of MedImpact's bad faith conduct in the Arbitration.

86.   The statute of limitations should be tolled, pursuant to and without limitation, the discovery rule, equitable tolling, equitable estoppel, fraudulent concealment, and the continuing violation and continuous accrual doctrines.

87.   Notably, within three weeks of learning of MedImpact's ██████████ ████████████████████████████████████████████████████████████████ ████████████ Plaintiffs filed counterclaims relating to the drug-to-diagnosis edits against Defendants in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*  Within one week of the Court denying the addition of the counterclaims to that case (because the deadline for amending the pleadings had passed), Plaintiffs filed the above captioned Complaint.

88.   Plaintiffs' claims presented herein are timely.

### CLAIMS FOR RELIEF

### COUNT I

**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*)**

**Against All Defendants**

89.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

90.   Plaintiffs own and possess certain confidential, proprietary and trade secret information, through the acquisition of Dimensions, including Plaintiffs' custom logic and methods behind building and maintaining the logic that links between content and relational lists connecting drugs to diseases and conditions, including how an edit adjudicating engine works and the populated content within it, and validation of the

edits, referred to herein as drug-to-diagnosis indication and contraindication edits, which constitute protectable trade secrets.

91.     This confidential, proprietary and trade secret information relates to products and/or services used in, and/or intended for use in, interstate or foreign commerce.

92.     Plaintiffs developed their confidential and proprietary drug-to-diagnosis indication and contraindication edits for thousands of medications, over years, through the dedicated work of numerous full-time employees, including pharmaceutical experts. Through their theft, Defendants bypassed years of research and development time, and avoided tens of millions of dollars in investment.

93.     Plaintiffs have taken substantial measures to keep such information secret and confidential.

94.     This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

95.     In violation of Plaintiffs' rights, including following the enactment of the Defend Trade Secrets Act, Defendants have misappropriated Plaintiffs' trade secrets, in the various improper and unlawful ways as alleged herein, including by using, offering for sale and/or providing Plaintiffs' trade secrets to health authorities and/or clients in Australia, the United States, South Africa, Canada, Turkey, ▮▮▮▮▮▮ ▮▮▮▮ and very likely other places (*e.g.*, China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom).  Defendants have derived actual economic value from their misappropriation and expect to continue to derive further value.

96.     Defendants gained access to Plaintiffs' trade secrets through the Joint Venture, under false pretenses.  Following execution of confidentiality agreements,

Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis edits, through numerous emails, teleconferences, and in-person meetings.  In addition, over the term of the Joint Venture, Defendants received and recorded the results of millions of combinations of the drug-to-diagnosis indication and contraindication edits.  As a result, Defendants acquired Plaintiffs' confidential and proprietary logic and methods underlying the drug-to-diagnosis edits.

97.    Defendants' misappropriation of Plaintiffs' confidential, proprietary and trade secret information was intentional, knowing, and willful.

98.    Defendants have failed to return Plaintiffs' confidential, proprietary and trade secret information, and have attempted to conceal their theft and use of such information.  If this wrongful conduct is not remedied, and if Defendants are not enjoined, they will continue to misappropriate, disclose, and use for their own benefit, and to Plaintiffs' detriment, Plaintiffs' trade secret information.

99.    Plaintiffs have been harmed and will continue to be irreparably harmed by Defendants' violation of the Defend Trade Secrets Act.  Plaintiffs are entitled to damages, in an amount to be determined at trial, and affirmative actions to protect Plaintiffs' trade secret information, including a seizure of all documents or information in Defendants' possession concerning or relating to Plaintiffs' trade secret information, as well as an award of exemplary damages and attorneys' fees.

## COUNT II

**Misappropriation of Trade Secrets Under California Uniform Trade Secrets Act Against All Defendants**

100.    Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

101.    Plaintiffs own and possess certain confidential, proprietary and trade secret information, through the acquisition of Dimensions, including Plaintiffs' custom logic and methods behind building and maintaining the logic that links between content and

relational lists connecting drugs to diseases and conditions, including how an edit adjudicating engine works and the populated content within it, and validation of the edits, referred to herein as drug-to-diagnosis indication and contraindication edits, which constitute protectable trade secrets.

102.   Plaintiffs developed the confidential and proprietary drug-to-diagnosis indication and contraindication edits for thousands of medications, over years, through the dedicated work of numerous full-time employees, including pharmaceutical experts. Through their theft, Defendants bypassed years of research and development time, and avoided tens of millions of dollars in investment.

103.   Plaintiffs have taken substantial measures to keep such information secret and confidential.

104.   This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

105.   In violation of Plaintiffs' rights, Defendants have misappropriated Plaintiffs' trade secrets, in the various improper and unlawful ways as alleged herein, including by using, offering for sale and/or providing Plaintiffs' trade secrets to health authorities and/or clients in Australia, the United States, South Africa, Canada, Turkey, ██████████████████ and very likely other places (*e.g.*, China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom). Defendants have derived actual economic value from their misappropriation and expect to continue to derive further value.

106.   Defendants' misappropriation of Plaintiffs' confidential, proprietary and trade secret information was intentional, knowing, and willful.

107.   Defendants gained access to Plaintiffs' trade secrets through the Joint Venture, under false pretenses.  Following execution of confidentiality agreements,

Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis edits, through numerous emails, teleconferences, and in-person meetings. In addition, over the term of the Joint Venture, Defendants received and recorded the results of millions of combinations of the drug-to-diagnosis indication and contraindication edits. As a result, Defendants acquired Plaintiffs' confidential and proprietary logic and methods underlying the drug-to-diagnosis edits.

108. Defendants have failed to return Plaintiffs' confidential, proprietary and trade secret information, and have attempted to conceal their theft and use of such information. If this wrongful conduct is not remedied, and if Defendants are not enjoined, they will continue to misappropriate, disclose, and use for their own benefit, and to Plaintiffs' detriment, Plaintiffs' trade secret information.

109. Plaintiffs have been harmed and will continue to be irreparably harmed by Defendants' violation of the California Uniform Trade Secrets Act. Plaintiffs are entitled to damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

## COUNT III

### Racketeer Influenced And Corrupt Organizations Act (18 U.S.C. § 1962(c))
### Against All Defendants

110. Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

111. Defendants qualify as "persons" under 18 U.S.C. § 1961(3).

112. Defendants are members of an associated-in-fact "enterprise" under 18 U.S.C. § 1961(4) (the "MedImpact RICO Enterprise"). Throughout its existence, the MedImpact RICO Enterprise engaged in, and its activities affected, interstate commerce because it involved commercial activities across state lines.

113. Each member of the MedImpact RICO Enterprise is separate and distinct from the Enterprise.

COMPLAINT

114. Defendants each participated in the conduct of the affairs of the MedImpact RICO Enterprise because each had some part in directing those affairs.

115. The MedImpact RICO Enterprise engaged in a pattern of racketeering activity under 18 U.S.C. § 1961(5).

116. Defendants each violated 18 U.S.C. § 1962(c). By violating 18 U.S.C. § 1962(c), the MedImpact RICO Enterprise caused concrete financial losses to the business and property of Plaintiffs. Accordingly, Plaintiffs are "person[s] injured in his or her business or property" by reason of Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

117. Defendants each engaged in, as well as aided and abetted, numerous predicate acts that constitute both a pattern of racketeering activity as well participation in the conduct of the affairs of the MedImpact RICO Enterprise.

118. For example, each member of the MedImpact RICO Enterprise engaged in trade secret misappropriation in violation of the federal Defend Trade Secrets Act. Such trade secret misappropriation is a RICO predicate. 18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1832, "relating to … theft of trade secrets").

119. Each member of the MedImpact RICO Enterprise engaged in wire fraud, which is likewise a RICO predicate. 18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1343). Plaintiffs relied, to their detriment, on Defendants' misrepresentations and omissions. Defendants knowingly and intentionally made these misrepresentations and omissions. The Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions. Defendants knew and intended that Plaintiffs would rely on these misrepresentations and omissions.

120. Defendants had a duty to disclose to Plaintiffs, based on the relationship between them. Plaintiffs worked with Defendants through the Joint Venture for years following the acquisition, during which time Defendants lured Plaintiffs into sharing their trade secrets with Defendants, based on materially false misrepresentations and

omissions that Defendants sought the trade secrets for purposes of the Joint Venture. Defendant Dale Brown additionally owed Plaintiffs a duty to disclose as a Board Member and General Manager of the Joint Venture, with fiduciary duties to the Joint Venture and Plaintiffs.

121.   Defendants' materially false statements and omissions include:

a. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████ ███████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████ At no time did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

b. The drug-to-diagnosis indication and contraindication edits were regularly discussed at the Joint Venture's P&T meetings.  For example, the minutes of the first JV P&T meeting on April 24, 2012, attended by ███████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████ as provided by
Dimensions.  The drug-to-diagnosis indication and contraindication edits
were further discussed at, at minimum, the following P&T meetings: May
23, 2012, attended by ████████████████ July 4, 2012, attended
by ██████████████████ October 10, 2012, attended by ████████
████████████████████████████████████ February
13, 2013, attended by ████████████████████████████
████████ ; December 17, 2014, attended by ██████████████
██████████ ; and July 1, 2015, attended by ████████████
████████████ .  At no time during the P&T meetings or otherwise
did Defendants disclose that Defendants were "partnering" with
Dimensions to gain access to the drug-to-diagnosis trade secrets, or had
misappropriated the drug-to-diagnosis trade secrets.

   c.   IQVIA AG acquired Dimensions in February 2016.   Following the
acquisition, MedImpact, Dimensions, and/or IQVIA engaged in numerous
communications—via email, teleconference, and in person—over the
course of years.  For example, ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████ participated in Joint
Venture Board meetings, including, without limitation:

     i.   April 29, 2016 Joint Venture Board meeting attended by ████████
████████████████████████████████████████████

    ii.   August 22, 2016 Joint Venture Board meeting attended by ████████
████████████████████████████████████████████████████
████████

iii. October 26, 2016 Joint Venture Board meeting attended by ███ ███████████████████████████████████████████ ████

iv. February 10, 2017 Joint Venture Board meeting attended by ███ ██████████████████████████████████████████████

v. May 4, 2017 Joint Venture Board meeting attended by ███ ██████████████████████████████████████████████ ██████ and

vi. September 12, 2017 Joint Venture Board meeting attended by ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████

At no time during the Board meetings or otherwise did Defendants disclose that they had misappropriated the drug-to-diagnosis trade secrets.

d. ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████   In requesting access to Plaintiffs' trade secrets, Defendants did not disclose that they sought such access to misappropriate the same.

e. In February 2018, Defendant Dale Brown advised Amit Sadana (IQVIA), Nitin Goel (IQVIA), Aravinda Tiwari (IQVIA), Yousef Ghosheh (Dimensions), Dr. Omar Ghosheh (Dimensions), James Gollaher (MedImpact U.S.), and Nancy Radtke (MedImpact U.S.), among others, that ██████████████████████████████████████████████ ██████████████████████████████████████████████

1  ██████████████████████████████████████ At no time did

2  Defendants disclose that the drug-to-diagnosis edits in MedImpact U.S.'s

3  PBM offering were misappropriated from Defendants and offered for sale

4  to other clients.

5  f.  ██████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 █████████████████ ████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ██████████████ On August 14, 2019, Ghosheh provided sample indication

23 and contraindication edits. ███████████████████████████████

24 ████████████████████████████████████████████████████

25 ██████████████████████████ (emphasis added).  Both

26 Guttikonda and Dr. Mahmood followed up to request the indication and

27 contraindication edits from Ghosheh, on November 21, 2019 and

28

COMPLAINT

November 30, 2019, respectively.  Ghosheh provided the indication and contraindication edits on December 20, 2019.  Plaintiffs provided these edits based on Defendants' *repeated* misrepresentations that they sought the information for the benefit of the Joint Venture's clients.  Defendants did not state the true reason they sought the edits—to offer such trade secrets for sale to other clients.

122.  In addition to these misrepresentations and omissions, Defendants, during the course of multi-year business relationships, sent numerous other communications to Plaintiffs, in the United States, by wire in furtherance of the scheme to defraud them.

123.  As is evidenced by the pattern of racketeering activity described herein, the members of the MedImpact RICO Enterprise are associated together for a common purpose, to unlawfully obtain Plaintiffs' trade secrets to unlawfully compete with the Joint Venture.  It is also clear from this pattern of racketeering activity that the MedImpact RICO Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.  There is a clear relationship among the members of the enterprise.  The enterprise has sufficient longevity to permit its members to pursue the enterprise's purpose.

124.  Each member of the MedImpact RICO Enterprise benefited from the common purpose of the scheme.

125.  Defendants' conduct in furtherance of this scheme was intentional.

126.  Plaintiffs each suffered concrete domestic injuries to their businesses and property as a direct and proximate result of the pattern of racketeering activity engaged in by the MedImpact RICO Enterprise.  Plaintiffs suffered the following injuries, and more, because of the misappropriation of their trade secrets, and because they relied on Defendants' fraudulent misrepresentations and omissions.

127.  Defendants' unlawful use of Plaintiffs' trade secrets, including, without limitation, offering and/or providing Plaintiffs' trade secrets for sale to health

authorities and/or clients in Australia, the United States, South Africa, Canada, Turkey, █████████████████████████ constitutes unlawful competition against the Plaintiffs.  Plaintiffs, acting through Dimensions, license their drug-to-diagnosis trade secrets to health authorities, to facilitate the monitoring and/or regulation of fraud, waste, and abuse of prescription medications.  Defendants' unlawful use, offers to sell and/or sale of Plaintiffs' trade secrets erodes the prices of Plaintiffs' own offerings (through Dimensions) of the drug-to-diagnosis indication and contraindication edits.

128.   Additionally, Defendants were required to obtain a license to Plaintiffs' drug-to-diagnosis indication and contraindication trade secrets, to use, offer for sale and/or sell such trade secrets, and Plaintiffs have been deprived of royalties from such license.

129.   Furthermore, the value of Plaintiffs' drug-to-diagnosis indication and contraindication edit trade secrets has been diluted by Defendants' misappropriation of those trade secrets and offers to provide those trade secrets around the world.

130.   Moreover, Plaintiffs have been deprived of the benefit of their years-long investment of time and money into the development of these trade secrets, which were stolen by Defendants.

131.   Plaintiffs have also been deprived of the benefit of the bargain of their acquisition of Dimensions—including the trade secrets—by Defendants' theft of these trade secrets.   Plaintiffs paid more than they otherwise would have to acquire Dimensions, including its intellectual property, had Plaintiffs known of Defendants' theft of the drug-to-diagnosis indication and contraindication edits (which Defendants concealed).

132.   Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.  Each Defendant is accordingly liable for three times Plaintiffs' actual damages to be determined at trial plus interest and attorneys' fees.

## **COUNT IV**

### **Breach of Fiduciary Duty and Duty of Loyalty**

### **Against Dale Brown**

133.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

134.   Plaintiffs' claim for breach of fiduciary duty and duty of loyalty stands separate and independent from their claims of trade secret misappropriation, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

135.   Defendant Dale Brown owed fiduciary obligations and duties of loyalty to the Joint Venture in his capacity as a Board Member and General Manager of the Joint Venture, and owed fiduciary obligations and duties of loyalty to Plaintiffs.  Brown was bound by his fiduciary obligations and duty of undivided loyalty to act in the best interests of the Joint Venture and Plaintiffs.

136.   Brown breached his fiduciary obligations and duties of loyalty to the Joint Venture and Plaintiffs by misusing Plaintiffs' confidential information in violation of confidentiality agreements; partnering with Dimensions under false pretenses; directly participating in making materially false and/or misleading statements to Plaintiffs about the purpose of the Joint Venture (concealing Defendants' fraudulent scheme from Plaintiffs); misusing Plaintiffs' confidential information; diverting opportunities away from the Joint Venture; and serving MedImpact's ulterior motives and engaging in self-dealing.

137.   Brown's breach of his fiduciary obligations and duties of undivided loyalty to the Joint Venture and Plaintiffs, by acting adversely to the interests of the Joint Venture and Plaintiffs, was a substantial factor in causing significant harm to Plaintiffs.

138.   As the proximate result of Brown's breach of his fiduciary duties and duties of undivided loyalty, Plaintiffs have suffered significant damage in an amount to

be determined at trial.  Additionally, because Brown acted with malice, Plaintiffs seek exemplary and/or punitive damages.

### COUNT V

**Civil Conspiracy**

**Against Dale Brown**

139.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

140.   Plaintiffs' claim for civil conspiracy stands separate and independent from their claims of trade secret misappropriation, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

141.   Defendant Dale Brown knowingly and willfully conspired and agreed with MedImpact to partner with Dimensions under false pretenses; misuse Plaintiffs' confidential information; divert opportunities away from the Joint Venture; and make materially false and/or misleading statements to Plaintiffs about the purpose of the Joint Venture (concealing Defendants' fraudulent scheme from Plaintiffs).  Brown furthered the conspiracy by pursuing the partnership with Dimensions to serve the ulterior motives of MedImpact; concealing his ulterior motives from Plaintiffs; misusing Plaintiffs' confidential information; and diverting opportunities away from the Joint Venture.

142.   Brown committed the wrongful acts herein alleged pursuant to, and in furtherance of, this conspiracy and agreement.

143.   As a proximate result of the wrongful acts alleged herein, Plaintiffs have suffered and will continue to suffer significant damages in an amount to be determined at trial.  Defendants are jointly and severally liable to Plaintiffs, and Plaintiffs are entitled to punitive damages against them.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment against Defendants as follows, and hold them jointly and severally liable:

    (i)    Judgment in Plaintiffs' favor against Defendants on all claims alleged herein;

    (ii)    A preliminary and permanent injunction to enjoin Defendants, and their agents, servants, employees, attorneys, successors, and assigns, and all persons, firms, and corporations acting in concert with them, from further misappropriation or use of Plaintiffs' trade secrets;

    (iii)    Order Defendants to pay compensatory damages in an amount to be determined at trial;

    (iv)    Order Defendants to pay consequential and actual damages or disgorgement of profits unjustly obtained in an amount to be determined at trial;

    (v)    Order Defendants to pay punitive and exemplary damages, including but not limited to punitive and exemplary damages for Defendants' willful and malicious misappropriation of Plaintiffs' trade secrets;

    (vi)    Order Defendants to pay reasonable attorneys' fees and allowable costs and expenses; and

    (vii)    Order all other such relief the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

144.    Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiffs hereby demand a trial by jury.

*[Signature Page Follows]*

COMPLAINT

Dated: December 13, 2021

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By: _____
CALLIE A. BJURSTROM

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
STEPHEN A. SWEDLOW*
MICHELLE SCHMIT*

Attorneys for Plaintiffs IQVIA INC. and
IQVIA AG

*Pro hac vice forthcoming

[ADDITIONAL COUNSEL]

Michael J. Finnegan, State Bar No. 137409
(appearance forthcoming)
mfinnegan@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN
LLP 725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:  213.488.7272
Facsimile:  213.629.1033

Kenneth W. Taber (pro hac vice forthcoming)
kenneth.taber@pillsburylaw.com
Daryl L. Kleiman (pro hac vice forthcoming)
daryl.kleiman@pillsburylaw.com
Chris Fennell (pro hac vice forthcoming)
chris.fennell@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN
LLP 31 West 52nd Street
New York, NY 10019-6131
Telephone: 212.858.1813
Facsimile:  212.298.8405

COMPLAINT