Stephen A. Swedlow
stephenswedlow@quinnemanuel.com
Michelle Schmit
michelleschmit@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
Telephone: 312.705.7400
Facsimile: 312.705.7401

Joseph C. Sarles (Bar No. 254750) (notice forthcoming)
josephsarles@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: 213.443.3000
Facsimile: 213.443.3100

[ADDITIONAL COUNSEL LISTED
ON SIGNATURE PAGE]

Attorneys for Plaintiffs IQVIA INC., IQVIA AG, and DIMENSIONS HEALTHCARE LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IQVIA INC., a Delaware corporation; IQVIA AG, a Swiss company; and DIMENSIONS HEALTHCARE LLC, a United Arab Emirates limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation; MEDIMPACT INTERNATIONAL LLC, a California limited liability company; MEDIMPACT INTERNATIONAL HONG KONG, LTD., a Hong Kong corporation; and DALE BROWN, individually,<br><br>Defendants. | Case No. 21-cv-02081-GPC-DEB<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR (1) MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA, 18 U.S.C. § 1836; (2) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT; (3) RICO; (4) BREACH OF FIDUCIARY DUTY; AND (5) CIVIL CONSPIRACY**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. Gonzalo P. Curiel<br>Magistrate Judge: Hon. Daniel E. Butcher<br>Dept: 2D<br><br>Action Filed: December 13, 2021<br>FAC Filed: May 6, 2022<br>Trial Date: None Set |

# COMPLAINT

IQVIA Inc., IQVIA AG (collectively, "IQVIA"), and Dimensions Healthcare LLC ("Dimensions" and collectively with IQVIA, "Plaintiffs"), by and through their counsel, for their Complaint against MedImpact Healthcare Systems, Inc. ("MedImpact U.S."), MedImpact International LLC ("MedImpact International"), MedImpact International Hong Kong Ltd. ("MedImpact Hong Kong") and Dale Brown (collectively, "Defendants"), hereby allege as follows:

## INTRODUCTION

1.     Beginning in 2011, Defendants schemed to steal confidential and proprietary trade secrets from Dimensions Healthcare LLC ("Dimensions") through a "partnership" with Dimensions in the Middle East (the "Joint Venture" or "MedImpact Arabia").[1]  IQVIA AG acquired Dimensions—including its intellectual property—in February 2016.  IQVIA AG is wholly-owned by IQVIA Inc.

2.     From the outset, Defendants targeted Dimensions as an ostensible "partner" for the express purpose of gaining access to Plaintiffs' trade secrets under the façade of the Joint Venture.  Defendants knew that by stealing those trade secrets, MedImpact U.S. would be able to build a better pharmacy benefits management ("PBM") platform[2] that would "leapfrog[]" MedImpact U.S.'s own PBM offering.  Specifically, Defendants planned to build what they called a new ████████████ ███████████████████████████████████—by, among other things, unlawfully incorporating Plaintiffs' trade secrets into the existing MedImpact U.S. PBM platform.

---

[1]   The Joint Venture was entered into between MedImpact International (a wholly-owned subsidiary of MedImpact U.S.) and Dimensions on February 1, 2012.  On January 1, 2014, MedImpact International transferred its interest in the Joint Venture to MedImpact Hong Kong (also a wholly owned MedImpact U.S. subsidiary).  MedImpact U.S., MedImpact International, and MedImpact Hong Kong are referred to collectively herein as "MedImpact."

[2]   A PBM platform is a platform that allows patients to obtain insurance approvals for prescribed medicines through online, real-time insurance coverage approvals or denials for prescribed medicines, based upon clinical algorithms, plan design rules, and member eligibility.

The very purpose of the ████████ was to develop an offering that would be deployed worldwide, including by MedImpact International and MedImpact Hong Kong internationally, and MedImpact U.S. in the United States. In other words, by incorporating Plaintiffs' trade secrets into the MedImpact U.S. ████████ MedImpact would offer for sale and/or provide Plaintiffs' trade secrets all over the world.

3.     At the center of Defendants' plot to exploit Plaintiffs' trade secrets were Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits. Drug-to-diagnosis <u>indication</u> edits provide a rejection alert when a patient requests to fill a prescription for a medication that is not used to treat that patient's medical diagnosis. For example, an indication edit would reject the incorrect prescription of an antibiotic—used to treat bacterial infections—for a viral infection, such as influenza. Relatedly, drug-to-diagnosis <u>contraindication</u> edits provide a rejection alert when a patient requests to fill a prescription for a medication that may result in an adverse drug event if the medication is taken by a patient with certain medical conditions.

4.     More specifically, Plaintiffs' drug-to-diagnosis indication and contraindication edits trade secrets are comprised of the custom logic and methods behind building and maintaining the logic that links between content and relational lists connecting drugs to diagnoses and conditions, including how an edit adjudicating engine works and the populated content within it, and validation of the edits.

5.     MedImpact did not have the ability to offer such drug-to-diagnosis indication and contraindication edits before "partnering" with Dimensions. Rather than invest the necessary resources, including time, talent, and money, to independently develop the requisite expertise to provide drug-to-diagnosis indication and contraindication edits, MedImpact decided to take a shortcut and steal the trade secrets instead.

FIRST AMENDED COMPLAINT

6.      In an October 2011 presentation to the MedImpact U.S. Senior Leadership Team and Board, Defendant Dale Brown specifically identified the ████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

7.      Unaware of Defendants' ulterior motives to misappropriate Plaintiffs' trade secrets, such trade secrets were transparently shared with MedImpact through the Joint Venture, including Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits trade secrets, subject to governing non-disclosure and confidentiality agreements.  Plaintiffs' closely held trade secret information was shared with MedImpact primarily via electronic means (*e.g.*, via email) as well as telephone calls and in person meetings.

8.      Defendants thereafter wrongfully exploited Plaintiffs' closely held trade secrets for MedImpact's own gain.  Defendants misused the "partnership" with Dimensions to gain access to the drug-to-diagnosis indication and contraindication edits trade secrets; engaged in years-long theft of those trade secrets; and exploited that theft by offering and/or providing these edits for sale in the United States, Australia, South Africa, Canada, Turkey, ████████████████████ (and very likely many other places, including, without limitation, China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom); all the while concealing the theft and misappropriation.

9.      Defendants' theft continued after IQVIA AG acquired Dimensions, including its drug-to-diagnosis indication and contraindication edits trade secrets, in 2016.  Both before and after the termination of the Joint Venture in 2017, Defendants

FIRST AMENDED COMPLAINT

offered these trade secrets to clients and health agencies all over the world.  Plaintiffs have every reason to believe this misappropriation is ongoing today.

10.    Through their theft, Defendants bypassed years of research and development time, and avoided tens of millions of dollars in investment.  At no point did Defendants disclose that they had been stealing Plaintiffs' trade secrets and offering them for sale in the United States, Australia, South Africa, Canada, Turkey, ███████ ███████████████ among other locations.  In fact, Defendants actively concealed these facts.

11.    In addition, Defendant Dale Brown engaged in the unlawful conduct detailed herein while serving on the Board of and as General Manager of the Joint Venture.  Brown, for his part, siphoned trade secrets from Plaintiffs, and turned around and offered such trade secrets for sale in at least the United States, Australia, South Africa, Canada, Turkey, ████████████████████.  Brown was a direct participant in the theft from and unlawful competition with Plaintiffs.  Again, at no time did Brown disclose that MedImpact was pillaging Plaintiffs' trade secrets.

12.    Plaintiffs seek damages for their injuries resulting from Defendants' unlawful conduct, and a permanent injunction enjoining Defendants from possessing, misappropriating and using Plaintiffs' trade secrets, among other relief.

## PARTIES

13.    Plaintiff IQVIA Inc. is organized and existing under the laws of the State of Delaware with a principal place of business in Plymouth Meeting, Pennsylvania.  IQVIA, directly and through various subsidiaries around the world, provides, among other things, market research, analytics, technology and services to the life sciences, medical device, and diagnostics and healthcare industries, to clients in over 100 countries.  IQVIA's global reach allows IQVIA's life sciences clients to improve their understanding of, and interaction with, the global healthcare environment and, in turn, improve patient outcomes and save lives.  Since its founding more than sixty years ago,

FIRST AMENDED COMPLAINT

IQVIA has invested substantial sums to bring a wide range of innovative market research, analytics, technology and services offerings to the life sciences, medical device, and diagnostics and healthcare industries.  Through those years, clients have realized substantial benefits from their use of IQVIA offerings.  As a consequence, IQVIA grew from a small business operating in two countries to a multi-billion dollar business employing approximately 70,000 people and operating in more than 100 countries.

14.    Plaintiff IQVIA AG has its principal place of business in Switzerland. IQVIA AG is wholly-owned by IQVIA Inc.  IQVIA AG is the controlling beneficial owner of Dimensions and has the exclusive power to control the operations of Dimensions.

15.    Plaintiff Dimensions Healthcare LLC is incorporated in the United Arab Emirates.  Dimensions is a leading developer of healthcare informatics solutions, including software development, clinical decision support systems, design, data collection, integration, requirements and business analysis, reporting quality indicators, claims data review, healthcare analytics, medical coding, technical consultancy services, policy making, medical coding training and system training.  Dimensions' primary business is to assist private and public sectors to offer higher-quality healthcare services by collecting and processing information that is used to decrease inefficiencies and reduce wasteful expenditures.  Dimensions' solutions focus on improving clinical outcomes and increasing efficiency.  Dimensions combines healthcare services and information technology to provide solutions for healthcare providers, payers, and government regulators.

16.    Defendant MedImpact Healthcare Systems, Inc. (MedImpact U.S.) is a privately held California corporation with its principal place of business in San Diego, California.  MedImpact U.S. wholly owns its subsidiary MedImpact International LLC, and MedImpact International LLC in turn wholly owns its subsidiary MedImpact

5

International Hong Kong Ltd.  According to MedImpact, "[MedImpact Hong Kong's] revenue is predominantly from the [Joint Venture].  [MedImpact Hong Kong's] revenue is ultimately passed through [MedImpact International], and consolidated in [MedImpact U.S.'s] financial statements.  [MedImpact U.S.] has also invested revenue and San Diego-based resources, including, labor to support [MedImpact Hong Kong]." *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 93, ¶ 77.

17.     Defendant MedImpact International LLC ("MedImpact International") is a limited liability company established and existing under the laws of California. MedImpact International is a wholly owned subsidiary of MedImpact U.S.  MedImpact International commenced its international business operations in 2011, through partnering with Dimensions in the Joint Venture.  According to MedImpact, MedImpact International's "principal place of business is in San Diego, California," and MedImpact International's "employees and officers work primarily from MedImpact's headquarters in San Diego, California."  *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 93, ¶¶ 15, 150, 194, 214.

18.     Defendant MedImpact International Hong Kong Ltd. ("MedImpact Hong Kong") is a private Hong Kong corporation, and is a wholly owned subsidiary of MedImpact International.   According to MedImpact, MedImpact Hong Kong's "principal place of business is also in San Diego, California where MedImpact is headquartered," and "MedImpact employees in San Diego support [MedImpact Hong Kong's] business strategies and initiatives."  *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 93, ¶¶ 16, 150, 194, 214.

19.     Defendant Dale Brown, an individual, and previously a Board Member and the General Manager of MedImpact Arabia at all relevant times herein, owed and breached his fiduciary obligations to Plaintiffs.  Brown is the former President of

MedImpact U.S.; former President (and previously, Senior Vice President) of MedImpact International; and, upon information and belief, was a resident of California at all relevant times herein, and remains a resident of California.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as this dispute arises by virtue of Defendants' violations of 18 U.S.C. § 1836, *et seq.* and 18 U.S.C. § 1962(c), *et seq.*  This Court likewise has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

21.     Defendants are subject to personal jurisdiction in this district, as MedImpact U.S. is a California corporation with its principal place of business in San Diego, California; MedImpact International is a limited liability company established and existing under the laws of California with its principal place of business in San Diego, California; MedImpact International Hong Kong Ltd.'s principal place of business is in San Diego, California; and Dale Brown, upon information and belief, is and was at all relevant times herein a resident of California.  Further, Defendants' wrongful conduct was conducted within California, including at MedImpact U.S.'s headquarters in San Diego, California.

22.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendants reside in the District.

## BACKGROUND

**A.     Plaintiffs' Drug-to-Diagnosis Indication and Contraindication Edits Trade Secrets**

FIRST AMENDED COMPLAINT

23.    Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits save patients' lives, by preventing patients from taking unnecessary medications or medications that may otherwise cause them harm.  As Defendant Dale Brown explained in an October 2014 article for Premium magazine: "Preventing contraindicated or unnecessary medications is better for patients and insurers.  Consuming unnecessary medications can potentially lead to patient sickness, preventable medical errors and ADEs [Adverse Drug Events], which are defined by the US Food and Drug Administration (FDA) as an event for a patient taking a drug when the outcome of taking that drug is life-threatening, requires hospitalisation [sic], creates disability and/or requires intervention to prevent permanent impairment or damages."

24.    As one of many examples, Plaintiffs' drug-to-diagnosis indication and contraindication edits have been critically important to preventing the over-prescription of and growing resistance to antibiotics.  As Brown detailed in the Premium article referenced above: "MedImpact Arabia identified that up to 37 percent of antibiotics being prescribed in the UAE may be clinically inappropriate … Unnecessary or incorrect antibiotic use places the entire UAE population at risk for bacterial infections that may become less treatable due to increasing resistance … Since its broad implementation in 2012, our proprietary systems for checking clinical appropriateness of antibiotic and anti-infective drugs has reduced the total number of antibiotic and anti-infective claims by 20 percent."

25.    Taken together, Plaintiffs' drug-to-diagnosis indication and contraindication edits generate a substantial percentage of alerts and/or rejections, and are thus highly valuable to clients by minimizing errors, fraud, waste, and/or abuse of medications and driving savings.  As MedImpact has stated, Plaintiffs' drug-to-diagnosis indication and contraindication edits accounted for ███████████ ███████████████████ in the UAE, rendering it one of the most valuable clinical edits available to clients.

8

26.    Plaintiffs' confidential and proprietary drug-to-diagnosis indication and contraindication edits, for thousands of medications, were developed over years (including well before the Joint Venture), through the dedicated work of numerous full time employees, including pharmaceutical experts.  This effort entailed collating and reviewing medical data from a large number of sources to populate a database, building the logic to run the indication and contraindication edits, and validating the edits.

27.    Plaintiffs undertake substantial efforts to protect their trade secrets, including their confidential and proprietary drug-to-diagnosis indication and contraindication edits.  For example, Plaintiffs regularly use non-disclosure agreements and confidentiality agreements to protect information in the course of their business and to secure their intellectual property.  Plaintiffs further employ physical and technical restrictions to prevent the theft of their intellectual property, such as firewalls, private networks, password protections, and other technical mechanisms to ensure the security of their trade secrets.

**B.     Defendants Conspired to "Partner" with Dimensions to Gain Access to the Drug-to-Diagnosis Indication and Contraindication Trade Secrets**

28.    According to MedImpact, "[i]n or around 2010 to 2011, [MedImpact U.S.] was interested in expanding its PBM platform globally."  *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 93, ¶ 30.  To do so, MedImpact U.S. "formed [MedImpact International] to expand its PBM services in the international market," and "[i]n or around 2011, [MedImpact International] began discussions with Dimensions…"

29.    Months before MedImpact International and Dimensions even entered into the Joint Venture Agreement (in February 2012), Defendants began inquiring into drug-to-diagnosis indication and contraindication edits. ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17     32.    Just a few weeks later,

18

19

20

21

22

23

24     3   Shortly  thereafter

25

26

27

28

FIRST AMENDED COMPLAINT

33.     Less than two months later, ████████████████████
████████████████████████████████████████████████
████

34.     As of 2011, Defendants thus knew that they could gain access to confidential and proprietary drug-to-diagnosis indication and contraindication edits—a capability that MedImpact U.S. did not have—by partnering with Dimensions, and could in turn exploit these trade secrets for the strategic benefit of MedImpact U.S.

35.     So, at the urging of MedImpact U.S., MedImpact International and Dimensions entered into the Joint Venture Agreement on February 1, 2012.

36.     It was through the Joint Venture that Defendants then gained access to the drug-to-diagnosis trade secrets.  Following execution of confidentiality agreements, Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis indication and contraindication edits, through numerous emails, teleconferences, and in-person meetings.

37.     In addition, over the term of the Joint Venture, Defendants received and recorded the results of millions of combinations of the drug-to-diagnosis indication and contraindication edits.  As a result, Defendants acquired the confidential and proprietary logic and methods underlying the drug-to-diagnosis edits. ██████████████
████████████████████████████████████████████████
████████████████████████████████████

**C.     Defendants Schemed to Build a PBM Platform Based on Plaintiffs' Trade Secrets**

38.     According to MedImpact, MedImpact U.S.'s "PBM platform is used to support MedImpact's … business in the United States and under license, is also

FIRST AMENDED COMPLAINT

currently used abroad by [MedImpact International] and [MedImpact Hong Kong]." *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.), Dkt. 93, ¶ 14.  Defendants knew that incorporating Plaintiffs' trade secrets into MedImpact U.S.'s PBM platform would "leapfrog[]" the MedImpact U.S. platform forward, to the benefit of MedImpact U.S., MedImpact International, and MedImpact Hong Kong.

39.   In a March 2013 conference, Defendant Dale Brown said as much, representing to attendees that the Joint Venture's ███████████████████ ████████████████████████████████████████████████████ Similarly, Dale Brown's LinkedIn Profile stated that "the first PBM in the United Arab Emirates … leapfrogg[ed] US based PBM platforms by leveraging latest technologies with an expanded portfolio of clinical algorithms."

40.   As MedImpact concedes, MedImpact's offering in the UAE was based on MedImpact U.S.'s platform under license to MedImpact International and MedImpact Hong Kong. *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 93, ¶ 14.  It was therefore Plaintiffs' drug-to-diagnosis edits that leapfrogged the Joint Venture's PBM offering ahead of the MedImpact U.S. platform.

41.   Recognizing this, Defendants developed a strategic plan to misappropriate Plaintiffs' trade secrets, with the intent to incorporate them into the MedImpact U.S. platform, and then deploy the trade secrets around the world.

42.   More specifically, Defendants' plan was to develop a ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████

FIRST AMENDED COMPLAINT

43.     To accomplish this, MedImpact needed to incorporate the drug-to-diagnosis edits into its U.S. PBM platform, planning to ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████

44.     But Defendants wanted to avoid the need to invest the necessary time and expense to develop drug-to-diagnosis edits.  Having failed to develop a home-grown capability to meet customer demand and regulatory requirements for drug-to-diagnosis indication and contraindication edits, Defendants decided to simply steal the same.

45.     Following Dimensions' notice of termination of the Joint Venture in 2017, MedImpact, including Defendant Dale Brown, ████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████   ████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████

46.     ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████

47.     MedImpact thereafter ████████████████████████████ ████████████████████████████████████████████

48.     As Defendant Dale Brown recounted ████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

1   ████████████████████████████   As Brown stated in the same internal email,

2   ████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ██████████████████████████████████████████

8        49.    MedImpact has and is continuing to misappropriate Plaintiffs' drug-to-

9   diagnosis edits trade secrets in connection with its MedBlocX offering.  According to

10   MedImpact, in an October 12, 2021 court filing, "Medblocx is a new product that will

11   be used in the UAE … Medblocx is currently being beta tested by a handful of

12   customers, but those customers do not have live production versions.  A limited version,

13   without a user interface, has been provided to three other customers."  *MedImpact*

14   *Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.

15   D. Cal.), Dkt. 345 at 6.

16        50.    MedImpact built MedBlocX based on Plaintiffs' trade secrets.  ████████

17   ████████████████████████████████████████████████████

18   ████████  ██████████  ████  ██████  ██████████  ████████  ████

19   ████████████████████████████████████████████████████

20   ████████████████████████████   (emphasis added).

21        51.   ████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████  ██████████████████

25   ████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28

FIRST AMENDED COMPLAINT

1  ███████████████████████████████████████████████████████

2  ████████████████████

3       52.     ██████████████████████████████████████

4  ███████████████████████████████████████████████████████

5  ███████████████████████████████████████████████████████

6  ████████████████████████  ████████████████████

7  ███████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████

9       53.     Hmeidan and Liu both reported to Defendant Dale Brown.

10  **D.    Defendants Offer Plaintiffs' Trade Secrets for Sale Across the World**

11       54.     Defendants have offered and/or provided Plaintiffs' confidential and

12  proprietary drug-to-diagnosis indication and contraindication edits for sale in the United

13  States, Australia, South Africa, Canada, Turkey, ████████████████████████ (and

14  very likely other locations, such as China, Germany, Ghana, India, Indonesia, New

15  Zealand, Taiwan, Sweden, and/or the United Kingdom).

16       55.     *First*, as it relates to Australia, Defendant Dale Brown, on behalf of

17  MedImpact, responded to an Expression of Interest from the Australian government in

18  October 2014, relating to the provision of PBM services in Australia.  In MedImpact's

19  response, submitted by Brown, ████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████

23       56.     Of course, the PBM services offered by the Joint Venture in the UAE

24  *incorporate* Plaintiffs' drug-to-diagnosis edits trade secrets.  Indeed, Brown, on behalf

25  of MedImpact, expressly offered to provide the Australian government such

26  confidential and proprietary drug-to-diagnosis edits, highlighting drug-to-diagnosis

27

28

FIRST AMENDED COMPLAINT

indication and contraindication edits as ███████████████████████████ ████████████████████.[4]

57.    In 2017, MedImpact *again offered* the confidential and proprietary drug-to-diagnosis edits to the Australian government, again with the direct involvement and participation of Defendant Dale Brown.

58.    *Second*, as it relates to South Africa, in November 2016 MedImpact entered into a partnership with ███████████████████████████ a company in South Africa, to offer PBM services there.  The MedImpact-████ partnership was managed by Defendant Dale Brown, along with many of the same MedImpact employees responsible for the Joint Venture.

59.    MedImpact intended from the outset to provide drug-to-diagnosis indication and contraindication edits in South Africa, based on Plaintiffs' confidential and proprietary trade secrets.  For example, ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████.

───────────────

[4] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████.

60. ███████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

61.   *Third*, MedImpact U.S. likewise appears to have incorporated Plaintiffs' drug-to-diagnosis indication and contraindication edits into MedImpact U.S.'s PBM platform.  For example, ██████████████████████████████
████████████████████████████████████████████████
████████████████

62.   In February 2018, Defendant Dale Brown advised the Board of the Joint Venture (including IQVIA employees) that ████████████████████
████████████████████████████████████████████████
███████████████████████████  On information and belief, the drug-to-diagnosis indication and contraindication edits in the MedImpact U.S. PBM offering were derived from Plaintiffs' confidential and proprietary information.

63.   *Fourth*, as it relates to Canada, MedImpact U.S. prepared a response to a Request for Proposal from ███████████████████████████████
██████████████ with the assistance of Defendant Dale Brown and MedImpact's Dr. Queenie Liu.  MedImpact proposed a solution to █████████████████
██████████████████████ On information and belief, MedImpact offered and/or provided for sale Plaintiffs' drug-to-diagnosis trade secrets █████ in Canada. ██████████████████████████████████████████
████████████████████████████████████████████████
██████

64.   *Fifth*, in February 2018, Dr. Amar Mahmood, Medical Director and Deputy Regional Manager of MedImpact International, contacted a private medical

FIRST AMENDED COMPLAINT

insurer in Turkey ████████. Mahmood followed up in May 2018, stating that MedImpact was ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

MedImpact specifically offered and/or provided for sale drug-to-diagnosis trade secrets, which, based on information and belief, were misappropriated from Plaintiffs.

65.    Before then, in September 2016, MedImpact made a proposal to ██

████████████████████████████████████████████████████████████

███████████████████████████████—the trade secrets at issue here, and, which based on information and belief, were misappropriated from Plaintiffs.

66.    *Sixth*, as it relates to ████████████████████████

████████████████████████████████████████████████████████████

█████████████████

67.    *Seventh*, as it relates to ████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

68.    *Eighth*, as it relates to ████████████████████████

████████████████████████████████████████████████████████████

69.    *Ninth*, MedImpact has additionally provided or offered to provide MedBlocX through the Joint Venture in the Middle East. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████    As of November 2021, Dimensions is no longer a member of the Joint Venture, and MedImpact's use of Plaintiffs' trade secrets to provide or offer MedBlocX to current or prospective clients of the Joint Venture is unlawful.

FIRST AMENDED COMPLAINT

70.     On information and belief, MedImpact, with the direct involvement of Defendant Dale Brown, has additionally taken steps to offer and/or provide its MedImpact U.S. PBM offering and/or MedBlocX—which, on information and belief, includes Plaintiffs' drug-to-diagnosis trade secrets—for sale in China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom, among other locations.

**E.     Defendants Conceal their Theft of Trade Secrets**

71.     At no time did Defendants ever disclose that they had used their "partnership" with Dimensions to gain access to Plaintiffs' trade secrets; that they had misappropriated those trade secrets; or that Defendants were offering drug-to-diagnosis indication or contraindication edits in the United States, Australia, South Africa, Canada, Turkey, ████████████████ (or elsewhere) based on these trade secrets.     Instead, Defendants continually concealed, and otherwise deliberately misrepresented their misconduct.  For example:

a. ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████ █ ██████████ ████ █ █████ ██████ █
████████ At no time did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade

secrets █████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

b.  The drug-to-diagnosis indication and contraindication edits were regularly discussed at Pharmacy and Therapeutics ("P&T") meetings.  For example, the minutes of the first P&T meeting on April 24, 2012, attended by ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ as provided by Dimensions.   The  drug-to-diagnosis  indication  and contraindication edits were further discussed, at minimum, during the following P&T meetings: May 23, 2012, attended by ███████████ ██████  July 4, 2012, attended by ███████████████ October 10, 2012, attended by ███████████████████████ ████████████████████████  February 13, 2013, attended by █████ ████████████████████████  December 17, 2014, attended by ██████████████████████████; and July 1, 2015, attended by ███████████████████  At no time during the P&T meetings or otherwise did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets, or had misappropriated the drug-to-diagnosis trade secrets.

c.  IQVIA AG acquired Dimensions in February 2016.   Following the acquisition, MedImpact, Dimensions, and/or IQVIA engaged in numerous communications—via email, teleconference, and in person—over the course of years.  For example, ████████████████████████████

FIRST AMENDED COMPLAINT

1   ████████████████████████████████████████████

2   ████████████████████████████████████████████

3   ███████████████████████████████████ participated in

4   Joint Venture Board meetings, including, without limitation:

5       i.   April 29, 2016 Joint Venture Board meeting attended by ████

6   ██████████████████████████████████████████

7       ii.  August 22, 2016 Joint Venture Board meeting attended by ████

8   ██████████████████████████████████████████

9   █████

10      iii. October 26, 2016 Joint Venture Board meeting attended by ████

11  ██████████████████████████████████████████

12  █████

13      iv.  February 10, 2017 Joint Venture Board meeting attended by ████

14  ██████████████████████████████████████████

15      v.   May 4, 2017 Joint Venture Board meeting attended by ████

16  ██████████████████████████████████████████

17  █████ ; and

18      vi.  September 12, 2017 Joint Venture Board meeting attended by

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████

21  ████████████████████████████████

22  At no time during the Board meetings or otherwise did Defendants disclose

23  that they had misappropriated the drug-to-diagnosis trade secrets.

24  d.  █████████████████████████████████████████

25  ██████████████████████████████████████████

26  ██████████████████████████████████████████

27  ██████████████████████████████████████████

28

FIRST AMENDED COMPLAINT

██████████████████████████████████████████████ In requesting access to Plaintiffs' trade secrets, Defendants did not disclose that they sought such access to misappropriate the same.

e.  In February 2018, Defendant Dale Brown advised Amit Sadana (IQVIA), Nitin Goel (IQVIA), Aravinda Tiwari (IQVIA), Yousef Ghosheh (Dimensions), Dr. Omar Ghosheh (Dimensions), James Gollaher (MedImpact U.S.), and Nancy Radtke (MedImpact U.S.), among others, that ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ At no time did Defendants disclose that the drug-to-diagnosis edits in MedImpact U.S.'s PBM offering were misappropriated from Defendants and offered for sale to other clients.

f.  During a September 23, 2018 case management conference in the Arbitration, counsel for MedImpact argued that at paragraph 267 of the Statement of Defence & Counterclaim, ██████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████ (emphasis added).

This statement by MedImpact counsel was, we now know, false when made, because it was made *after* ████████████████████████

████████████████████████████████████████████████

██████

g.  On December 14, 2018, MedImpact submitted the Expert Report of Heather Bates in the Arbitration, which falsely stated that (1) ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ and (2) ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ ████ ██████ ██████ █████ ████████ ███

████████████████████████████████████████████████

██████  These statements were, as we also now know, false when made, because they were made *after* ██████████████████

████████████████████████████████████████████████

██████

h.  In a January 3, 2019 sworn witness statement submitted in the Arbitration, Defendant Dale Brown falsely stated that █████████████████

████████████████████████████████████████████████

████████████████  (emphasis added).  This sworn statement was also false when made because, at the time this statement was made, ████████

1 ██████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 █████████████████████████

6     i.  In the same sworn statement, Brown stated that ███████████

7 ██████████████████████████████████████████████

8 ██████████████████████████████████████████████

9 ██████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 (emphasis added).  This sworn statement was false when made because, at

12 the  time  this  statement  was  made, ██████████████████████████

13 ██████████████████████████████████████████████

14 ██████████████████████████████████████████████

15 ████████

16     j.  In  the  same  sworn  statement,  Brown  falsely  stated,  with  respect  to

17 MedBlocX, that ████████████████████████████████

18 ██████████████████████████████████████████████

19 ██████████████████████████████████████████████

20 ██████████████████████████████████████████████

21 ████████████████████████████████

22     k.  In their January 3, 2019 Reply and Defence to Dimensions' counterclaims

23 in  the  Arbitration,  MedImpact  International  and  MedImpact  Hong  Kong

24 ██████████████████████████████████████████████

25 █████████████████  This denial  was  also  false  when  made,  because  it

26 was made *after* █████████████████████████████████

27 █████████████████████████████████████

1   l.   In the same Reply and Defence, MedImpact International and MedImpact

2        Hong Kong falsely represented that ████████████████████████

3        ████████████████████████████████████████████████████

4        ████████████████████████████████████████████████████

5        ████████████████████████████████████████████████████

6        ██████████████████████████

7   m.  In the same Reply and Defence, MedImpact International and MedImpact

8        Hong Kong falsely represented that ████████████████████████

9        ████████████████████████████████████████████████████

10       ████████████████████████████████████████████████████

11       ████████████████████████████████████████████████████

12       ████████████████████████████████████████████████████

13       ██████████  This statement was false when made, because it was made *after*

14       ████████████████████████████████████████████████████

15       ████████████████████████████████

16   n.  In MedImpact's February 11, 2019 Skeleton Argument, MedImpact

17       falsely   represented   that   ████████████  ████████████  ████████  █

18       ████████████████████████████████████████████████████

19       ████████  ████████  ██  ██  ████████  ██  ████████  ████████  █

20       ████████████████████████████████████████████████████

21       ██████████████████  This statement was false when made, because it was

22       made *after* ████████████████████████████████████████████

23       ████████████████████████████████

24   o.   In the same Skeleton Argument, MedImpact falsely represented that ████

25       ████████████████████████████████████████████████████

26       ██████████████  This statement was false when made, because it was made

27

28

1  *after* ███████████████████████████████████
2  ███████████████████████████
3  p. In the same Skeleton Argument, MedImpact falsely represented that
4  ███████████████████████████████████████
5  ███████████████████████████████████████
6  ███████████████████████████████████████
7  ███████████████████████████████████████
8  ███████████████████████████████████████
9  ███████████████████████████████████████
10 ████████████ This statement was false when made, because it was
11 made *after* ███████████████████████████
12 ███████████████████████████████
13 q. ████████████████████████████████████
14 ███████████████████████████████████████
15 ███████████████████████████████████████
16 ███████████████████████████████████████
17 ███████████████████████████████████████
18 ███████████████████████████████████████
19 ███████████████████████████████████████
20 ███████████████████████████████████████
21 ███████████████   ██████████████████████
22 ███████████████████████████████████████
23 ███████████████████████████████████████
24 ███████████████████████████████████████
25 ███████████████████████████████████████
26 ███████████████████████████████████████
27 ███████████████████████████████████████
28



FIRST AMENDED COMPLAINT

On August 14, 2019, Ghosheh provided sample indication and contraindication edits. ▆▆

Both Guttikonda and Dr. Mahmood followed up to request the indication and contraindication edits from Ghosheh, on November 21, 2019 and November 30, 2019, respectively. Ghosheh provided the indication and contraindication edits on December 20, 2019.  Plaintiffs provided these edits based on Defendants' *repeated* misrepresentations that they sought the information for the benefit of the Joint Venture's clients.  Defendants did not state the true reason they sought the edits—to offer such trade secrets for sale to other clients.

72.    Had Plaintiffs known Defendants' true intent, they would not have provided access to their trade secrets.  Thus, but for Defendants' material misrepresentations and omissions, Defendants would not have gained access to Plaintiffs' trade secrets.

**F.    The Injury Caused by Defendants' Unlawful Conduct**

73.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have been and continue to be injured.

74.    Defendants' unlawful use of Plaintiffs' trade secrets, including, without limitation, offering and/or providing Plaintiffs' trade secrets for sale to health authorities and/or clients in the United States, Australia, South Africa, Canada, Turkey, ▆▆▆▆▆▆▆▆▆▆▆, constitutes unlawful competition against Plaintiffs. Plaintiffs, acting through Dimensions, license their drug-to-diagnosis trade secrets to health authorities, including in the Middle East, to facilitate the monitoring and/or

FIRST AMENDED COMPLAINT

regulation of fraud, waste, and abuse of prescription medications.  Defendants' unlawful use, offers to sell and/or sale of Plaintiffs' trade secrets erodes the prices of Plaintiffs' own offerings (through Dimensions) of the drug-to-diagnosis indication and contraindication edits.  Defendants' offers to sell and or/sale of Plaintiffs' trade secrets in the United States, Australia, South Africa, Canada, Turkey, █████████████ █████ has, upon information and belief, further resulted in lost sales for Plaintiffs.

75.    Additionally, Defendants were required to obtain a license to Plaintiffs' drug-to-diagnosis indication and contraindication trade secrets, to use, offer for sale and/or sell such trade secrets, and Plaintiffs have been deprived of royalties from such license.

76.    Furthermore, the value of Plaintiffs' drug-to-diagnosis indication and contraindication edits trade secrets has been diluted by Defendants' misappropriation of those trade secrets and offers to provide those trade secrets around the world.

77.    Moreover, Plaintiffs have been deprived of the benefit of their years-long investment of time and money into the development of these trade secrets, which were stolen by Defendants.

78.    Plaintiffs have also been deprived of the benefit of the bargain of their acquisition of Dimensions—including the trade secrets—by Defendants' theft of these trade secrets.  Plaintiffs paid more than they otherwise would have to acquire Dimensions, including its intellectual property, had Plaintiffs known of Defendants' theft of the drug-to-diagnosis indication and contraindication edits (which Defendants concealed).

79.    In addition, by stealing Plaintiffs' trade secrets and engaging in the unlawful conduct described herein, Defendants bypassed years of research and avoided development time and tens of millions of dollars of investment expense.  In doing so, Defendants caused tens of millions of dollars in damages to Plaintiffs.

## STATUTE OF LIMITATIONS

FIRST AMENDED COMPLAINT

80.     Plaintiffs did not have actual or constructive knowledge of the facts underlying the allegations in this Complaint in February 2018, when Dimensions filed its counterclaim in *MedImpact International LLC, et al. v. Dimensions Healthcare LLC, et al.*, DIFC-LCIA Arbitration No: DC18141 ("Arbitration").   Nor did Plaintiffs, through discovery in the Arbitration, obtain evidence to provide a basis under Federal Rule of Civil Procedure Rule 11, to file their claims in the above captioned action. Plaintiffs did not have actual or constructive knowledge of the facts underlying the allegations in this Complaint until summer 2021 at earliest—when the MedImpact Defendants first produced documents in connection with *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.).

81.     Prior to summer 2021, Plaintiffs did not have actual or constructive knowledge that MedImpact was developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs; that Plaintiffs' drug-to-diagnosis edits had been shared ████ ████████ or that MedImpact was offering Plaintiffs' drug-to-diagnosis edits for sale.

82.     On February 20, 2018, Dimensions diligently and timely filed its Response to the Request for Arbitration, including counterclaims for breach of contract against MedImpact International and MedImpact Hong Kong.   Dimensions alleged that MedImpact International and MedImpact Hong Kong had breached the parties' Joint Venture Agreement and Service Level Contract by using Dimensions' ████████ ████████████████████████████████

83.     Dimensions' *allegations* specific to the drug-to-diagnosis edits are set forth in paragraph 54 of the Response to the Request for Arbitration.   In connection with the drug-to-diagnosis edits, Dimensions *alleged* that (1) ██████████████ ██████████████████████████ (2) MedImpact ████████████████████ ██████████████████████ (3) MedImpact ████████████ ██████████████████████████████

29

and (4) Mr. Brown stated in an email that ███████████████████████
███████████████████████████   In other words, Dimensions *alleged* that
MedImpact U.S. ██████████████████████████ (emphasis added), and that
MedImpact U.S. in turn licenses its PBM platform to MedImpact International and
MedImpact Hong Kong, such that MedImpact International and MedImpact Hong
Kong would have the same capabilities.

84.   Dimensions' allegations in its February 20, 2018 Response to the Request
for Arbitration related to MedImpact U.S.'s domestic PBM platform.   Dimensions'
allegations in its February 20, 2018 Response do not relate to MedBlocX at all.
Moreover, as of February 20, 2018, Plaintiffs did not have actual or constructive
knowledge that MedImpact was developing a new product to include drug-to-diagnosis
edits stolen from Plaintiffs (MedBlocX); that Plaintiffs' drug-to-diagnosis edits had
been shared ███████████ (to build MedBlocX); that MedImpact U.S.'s domestic PBM
engine included drug-to-diagnosis edits stolen from MedImpact; or that MedImpact was
offering Plaintiffs' drug-to-diagnosis edits for sale.   Plaintiffs only knew that, according
to Dale Brown, MedImpact's domestic PBM platform ███████████████████████
███████████████████.

85.   Paragraph 37 of Dimensions' February 20, 2018 Response to the Request
for Arbitration is not specific to, or otherwise related to, the drug-to-diagnosis indication
and contraindication edits. *See* Dkt. 60, at 13-14.  Paragraph 37 states that █████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
This reference to ███████████ however, is not specific to the drug-to-diagnosis edits in

FIRST AMENDED COMPLAINT

any way.  Dimensions' counterclaims in the Arbitration were far broader than the drug-to-diagnosis edits, and included counterclaims relating to ███████████████ ███████████████████████████ among other things.

86.     Similarly, Paragraph 59 of the Response to the Request for Arbitration does not relate to drug-to-diagnosis edits.  *See* Dkt. 60 at 13.  Paragraph 59 states: ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████  This allegation relates to ██████████████████████—not drug-to-diagnosis edits.

87.     Paragraph 67 of the Response to the Request for Arbitration likewise does not relate to drug-to-diagnosis edits, *see* Dkt. 60 at 13-14, and states that: █████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████

88.     On August 27, 2018, Dimensions filed a Statement of Defence & Counterclaim in the Arbitration.  Dimensions' allegations relating to the drug-to-diagnosis indication and contraindication edits are set forth at paragraphs 250-268 and 352-356 of the Defence & Counterclaim.  Here, Dimensions made the same allegations as set forth in Dimensions' Response to the Request for Arbitration, again based on the fact that MedImpact ███████████████████████████████████████████ ████████████████████████████████ and Mr. Brown stated in an email that ████ ███████████████████████████████████████

89.     No discovery had taken place in the Arbitration as of August 27, 2018, when Dimensions filed its Statement of Defence and Counterclaims.  As of that date, Plaintiffs did not have actual or constructive knowledge that MedImpact was developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs

31

(MedBlocX); that Plaintiffs' drug-to-diagnosis edits had been shared ███████ (to build MedBlocX); that MedImpact U.S.'s domestic PBM engine included drug-to-diagnosis edits stolen from MedImpact; or that MedImpact was offering Plaintiffs' drug-to-diagnosis edits for sale.

90.    Paragraph 247 in the Statement of Defence & Counterclaim *alleged* that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ This paragraph, however, is not specific to the drug-to-diagnosis edits, as Dimensions' counterclaims in the Arbitration were far broader than the drug-to-diagnosis edits, and included counterclaims relating to ███████████████████████████████ ██████████████, among other things. *See* Dkt. 60 at 14.

91.    In the allegations *specific to* ██████ in the August 27, 2018 Statement of Defence & Counterclaim—none of which relate to drug-to-diagnosis edits— Dimensions alleged that ████████████████████████ ████████████████████████ While Dimensions knew that MedImpact had retained ██████, Dimensions (and IQVIA) did not have actual or constructive knowledge that ████████████████████ to include drug-to-diagnosis edits stolen from Plaintiffs, that Plaintiffs' drug-to-diagnosis edits had been shared with ██████ to build MedBlocX, or that MedImpact was offering Plaintiffs' drug-to-diagnosis edits for sale.

92.    On January 17, 2019, Dimensions submitted the Second Witness Statement of Yousef Ghosheh in the Arbitration.  Mr. Ghosheh's witness statement stated that ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

FIRST AMENDED COMPLAINT

████████████   Mr. Ghosheh further noted that MedImpact ████████████

████████████████████████████████████████

93.   On January 17, 2019—within the three year statutes of limitations applicable to Plaintiffs' DTSA and CUTSA claims (the proposed counterclaims having been filed in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.) on September 1, 2021, and the above captioned case having been filed on December 13, 2021)—Dimensions filed a Rejoinder to MedImpact's January 3, 2019 Reply and Defence to Dimensions' counterclaims, stating that because Dimensions' expert ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████   In the same January 17, 2019 Rejoinder, Dimensions further noted that ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████   Dimensions' technical expert in the arbitration likewise opined (on December 14, 2018), with respect to the ████████ referenced above, that ████████████

████████████████████████████████████████

████████████████████████████████████████

94.   As of January 17, 2019, Plaintiffs still did not have actual or constructive knowledge that MedImpact was developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs (MedBlocX); that Plaintiffs' drug-to-diagnosis edits had been shared with ████████ (to build MedBlocX); that MedImpact U.S.'s domestic PBM

1     engine included drug-to-diagnosis edits stolen from MedImpact; or that MedImpact was

2     offering Plaintiffs' drug-to-diagnosis edits for sale.

3          95.     Plaintiffs' lack of actual or constructive knowledge is confirmed by the

4     opinions of Dimensions' technical expert in the Arbitration:

5          a.   As Dimensions' expert stated in his December 14, 2018 report, ████

6 ████████████████████████████████████████

7 ████████████████████████████████████████

8 ██████████████████████

9          b.   In his January 17, 2019 report, Dimensions' expert explained that ███

10 ████████████████████████████████████████

11 ████████████████████████████████████

12 ████████████████████████    As he explained, ██████

13 ████████████████████████████████████████

14 ████████████████████████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ████████████████████████████████████████

20 ██████

21          c.   In his February 12, 2019 report, Dimensions' expert opined that ████

22 ████████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 ██████████████████████████████████

27

28

FIRST AMENDED COMPLAINT

d.  In his February 24, 2019 testimony, Dimensions' expert agreed that ███

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

As the expert reports and testimony of Dimensions' expert confirms, through the date of the Arbitration hearing, which concluded on February 24, 2019, Plaintiffs still did not have actual or constructive knowledge that MedImpact was developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs (MedBlocX); that Plaintiffs' drug-to-diagnosis edits had been shared with ███████ (to build MedBlocX); that MedImpact U.S.'s domestic PBM engine included drug-to-diagnosis edits stolen from MedImpact; or that MedImpact was offering Plaintiffs' drug-to-diagnosis edits for sale.

96.  Dimensions was highly diligent in pursuing its claims in the Arbitration. The arbitrator recognized this, stating ████████████████████

████████████████████████████████████████

███████████████████████████████

97.  Notwithstanding Dimensions' diligence, Plaintiffs did not have constructive or actual knowledge as set forth herein, because MedImpact concealed evidence of MedImpact's misuse of Plaintiffs' drug-to-diagnosis trade secrets throughout the Arbitration.  For example, MedImpact refused to respond to document requests relating to the drug-to-diagnosis edits in the Arbitration, successfully blocking discovery into ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████  As a result, as noted above, Dimensions did not have access to

████████████████████████████████████████

███████████████████████  And, as also noted above,

██████████████████████████████████████████████████

████████████████████

98.   MedImpact additionally refused to provide sufficient access to Dimensions' expert in the Arbitration, to enable the expert to investigate Dimensions' counterclaim.

  a. As it relates to MedBlocX, MedImpact blocked Dimensions from inspecting MedBlocX at all.

  b. As it relates to MedImpact's domestic POS engine, as Dimensions' expert stated (in his January 17, 2019 report), ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████ Dimensions' expert further stated (in his February 12, 2019 report) that ████████████████████
████████████████████████████████████████
████████ ██████ ██ █████ █ ██████ ████████
████████████████████████████████████████
███████████████████

99.   In addition, throughout the Arbitration—which commenced on January 23, 2018 and concluded on July 24, 2019—MedImpact and Defendant Dale Brown falsely and repeatedly denied that MedImpact had misused Dimensions' drug-to-diagnosis indication and contraindication edits.  For example:

  a. During a September 23, 2018 case management conference, counsel for MedImpact argued that at paragraph 267 of the Statement of Defence & Counterclaim, ████████████████████████████████████

36

1

2

3

4

5

6

7

8

9

10

11 ████████████████████ (emphasis added).  This statement by

12 MedImpact counsel was false when made, because it was made *after*

13 ████████████████████████████████

14 ████████████████

15    b.  On December 14, 2018, MedImpact submitted the Expert Report of

16       Heather Bates in the Arbitration, which falsely stated that (1) ████

17 ████████████████████████████████

18 ████████████████████████████████

19 ████████████████████████████████

20 ████████████████████████████████

21 ████████████████████████ and (2) ███

22 ████████████████████████████████

23 ████████████████████████████████

24 ████████████████████████████████

25 ████████████████████████████████

26 ████████████████████████████████

27 ████ ██ ████ ███ ██ ██████ ███

28

1  ███████████████████████████████████████████████

2  ████████████    These statements were false when made, because they were

3  made *after* ███████████████████████████████████

4  ███████████████████████████████████

5  c.  In a January 3, 2019 sworn witness statement submitted in the Arbitration,

6     Defendant Dale Brown falsely stated that ██████████████████████

7     ███████████████████████████████████████████████

8     █████████████████  (emphasis added).  This sworn statement was  also

9     false when made because, at the time this statement was made, ███████████

10    ███████████████████████████████████████████████

11    ███████████████████████████████████████████████

12    ███████████████████████████████████████████████

13    ███████████████████████████████████████████████

14    ██████████████████████████

15  d.  In the same sworn statement, Brown stated that ██████████████████

16    ███████████████████████████████████████████████

17    ███████████████████████████████████████████████

18    ███████████████████████████████████████████████

19    ███████████████████████████████████████████████

20    (emphasis added).  This sworn statement was false when made because, at

21    the  time  this  statement  was  made, ███████████████████████

22    ███████████████████████████████████████████████

23    ███████████████████████████████████████████████

24    █████████

25  e.  In  the  same  sworn  statement,  Brown  falsely  stated,  with  respect  to

26    MedBlocX, that ███████████████████████████████

27    ███████████████████████████████████████████████

28

FIRST AMENDED COMPLAINT

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████

f. In their January 3, 2019 Reply and Defence to Dimensions' counterclaims in the Arbitration, MedImpact International and MedImpact Hong Kong ███████████████████████████████████ ██████████████ This denial was also false when made, because it was made *after* █████████████████████████████ ████████████████████████████████████

g. In the same Reply and Defence, MedImpact International and MedImpact Hong Kong falsely represented that ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

h. In the same Reply and Defence, MedImpact International and MedImpact Hong Kong falsely represented that ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████ This statement was false when made, because it was made *after* ████████████████████████████████████████ ███████████████████████████████

i. In MedImpact's February 11, 2019 Skeleton Argument, MedImpact falsely represented that ████████████  ████████  ████████  █ ████████████████████████████████████████

39

1   ████████   ████████ ██ █ █████ ██ ██████ █

2   ████████████████████████████████████████

3   ████████   This statement was false when made, because it was

4   made *after* ██████████████████████████████

5   ████████████████████████████ .

6   j.   In the same Skeleton Argument, MedImpact falsely represented that ██

7   ████████████████████████████████████████

8   ████████   This statement was false when made, because it was made

9   *after* ██████████████████████████████████

10  ████████████████████████████

11  k.   In the same Skeleton Argument, MedImpact falsely represented that

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████████████████████████

18  ████████   This statement was false when made, because it was

19  made *after* ██████████████████████████████

20  ████████████████████████████

21  100.   Defendants thus fraudulently concealed their misuse of Plaintiffs' drug-to-

22  diagnosis edits, by knowingly making false statements in the Arbitration, and

23  concealing highly relevant evidence.  Defendants intended to induce Dimensions to rely

24  on their misrepresentations in an effort to escape liability in the Arbitration.

25  101.   Justifiably relying on MedImpact's misrepresentations and as a direct

26  result of MedImpact's cover-up in the Arbitration, on March 6, 2019, ████████

27  ████████████████████████████████████████

28

40

1   ████████████████████████████████████████████████

2   ████████████████████████████████████████████████

3   ████████████████████████████████████████████████

4   ██████████████████████████████████

5      102.  As Defendants advised the arbitrator, █████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████      In other words, at the time Dimensions withdrew its

8   counterclaim, it did not have a basis to seek relief.

9      103.  As of the date of withdrawal of the counterclaim, on March 6, 2019,

10  Plaintiffs still did not have actual or constructive knowledge that MedImpact was

11  developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs

12  (MedBlocX); that Plaintiffs' drug-to-diagnosis edits had been shared with ██████ (to

13  build MedBlocX); that MedImpact U.S.'s domestic PBM engine included drug-to-

14  diagnosis edits stolen from MedImpact; or that MedImpact was offering Plaintiffs'

15  drug-to-diagnosis edits for sale.  Dimensions withdrew its counterclaim as a result.

16     104.  In its March 6, 2019 letter withdrawing its counterclaims—which was

17  within the three year statutes of limitations applicable to Plaintiffs' DTSA and CUTSA

18  claims (the proposed counterclaims having been filed in *MedImpact Healthcare*

19  *Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.) on

20  September 1, 2021, and the above captioned case having been filed on December 13,

21  2021)—Dimensions stated that ████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ██████████████████████████████████      As an initial

25  matter, the Arbitration hearing took place from February 18, 2019 to February 24,

26  2019—*within the statute of limitations period*.  Thus, the reference to potential

27  MedImpact ████████████████  does not establish actual or constructive knowledge

28

1  prior to the statute of limitations period.  Moreover, in this letter, Dimensions withdrew
2  *all* of its counterclaims—not just its counterclaim relating to drug-to-diagnosis edits,
3  such that this language is again not specific to drug-to-diagnosis edits.  In addition,
4  Dimensions' letter cites to an internal MedImpact document, █████████████████████
5  ████████████████████████████████████████████████████████████████████████████
6  ███████████████████  At the hearing, Mr. Brown testified that the platform for Canada had
7  not even been built: ████████████████████████████████████████████████████████
8  ████████████████████████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████████████████████████████
10 Mr. Brown further testified, ████████████████████████████████████████████████
11 █████████████████████

12     105.   The testimony of Yousef Ghosheh (Dimensions) at the Arbitration hearing
13 on February 21, 2019 cannot establish actual or constructive knowledge *prior* to the
14 statute of limitations period because, again, the Arbitration hearing was *within* the
15 statute of limitations period.  *See* Dkt. 60 at 14.  In any event, Mr. Ghosheh's testimony
16 that a file with potential drug-to-diagnosis edits █████████████████████████████
17 ██████████████████████  referred to the ███████████  discussed above.  As set forth
18 above, ██████████████████████████████████████████████████████████████████████
19 ████████████████████████████████████████████████████████████████████████████
20 As a result, Dimensions (and IQVIA) had no knowledge of whether the ███████████  in
21 fact included drug-to-diagnosis edits.  As Dimensions' expert explained, ███████████
22 ████████████████████████████████████████████████████████████████████████████
23 ████████████████████████████████████████████████████████████████████████████
24 █████████████████████

25     106.   Notwithstanding Dimensions' diligence in timely pursuing claims against
26 MedImpact in the Arbitration, because of MedImpact's false statements and
27 concealment in the Arbitration, Plaintiffs could not have discovered, and did not

28

FIRST AMENDED COMPLAINT

discover despite the exercise of reasonable diligence, that MedImpact was developing a new product to include drug-to-diagnosis edits stolen from Plaintiffs (MedBlocX); that Plaintiffs' drug-to-diagnosis edits had been shared with ███████ (to build MedBlocX); that MedImpact U.S.'s domestic PBM engine included drug-to-diagnosis edits stolen from MedImpact; and that MedImpact was offering Plaintiffs' drug-to-diagnosis edits for sale, until, at the earliest, the summer of 2021, in connection with discovery in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S. D. Cal.).

107.   On September 26, 2019, the MedImpact Defendants filed a complaint against IQVIA Holdings Inc., IQVIA Inc., IQVIA AG, Dr. Omar Ghosheh, and Amit Sadana.  *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), Dkt. 1.   In response to MedImpact's subsequently amended complaint (*id.*, Dkt. 93), IQVIA Inc. and IQVIA AG (along with the other Defendants in that case), timely filed an Answer on September 10, 2020, asserting an unclean hands defense, based on MedImpact's misappropriation of the drug-to-diagnosis edits, among other things.  *Id.*, Dkt. 131, at 26.

108.   At the time that IQVIA Inc. and IQVIA AG served their Answer to MedImpact's complaint on September 26, 2019, they (and Dimensions) did not have a basis under Federal Rule of Civil Procedure Rule 11 to file a counterclaim against MedImpact relating to the drug-to-diagnosis edits.  Dimensions had in fact withdrawn such claims in the Arbitration.

109.   IQVIA Inc. and IQVIA AG (along with the other Defendants in that case), thereafter diligently served discovery requests on November 17, 2020, to discover evidence in support of their unclean hands defense.  For example, IQVIA Inc. and IQVIA AG served the following requests:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIRST AMENDED COMPLAINT

110.   MedImpact's responses to these discovery requests were due in December 2020—still well within the statute of limitations period.   However, MedImpact purposefully delayed producing documents responsive to the foregoing requests within the statute of limitations period.   With limited exception, no MedImpact documents were produced in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.* before May 17, 2021.   And over half of MedImpact's documents in that case were produced on or after August 6, 2021.

111.   Plaintiffs did not have a Rule 11 basis to file a counterclaim or claim against MedImpact relating to the drug-to-diagnosis edits until summer 2021—*after* MedImpact produced the relevant documents in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.).   In fact, IQVIA Inc. and IQVIA AG (and other Defendants in that case) initially *withdrew* their unclean hands defense based on MedImpact's misappropriation of the drug-to-diagnosis edits, in a March 1, 2021 interrogatory response, due to the lack of basis for the defense at that time—*prior* to MedImpact's production of documents in that case.

112.   Plaintiffs first learned of MedImpact's ████████████████████ ████████████████████████████████████ on August 6, 2021. ██████████████████████████████████████████████████████ ███████████████████ and was only produced for the first time on August 6, 2021, in connection with M*edImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.).   Plaintiffs first learned that MedImpact was in turn offering MedBlocX—████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████ Given MedImpact's claim in an October 12, 2021 court filing that MedBlocX "is a **new product** that will be used in the UAE . . .," and ████████████████████████████████████████████ ██████████████████████████████████████████████████████

FIRST AMENDED COMPLAINT

█████████████████████████████████████.  Plaintiffs first learned that MedImpact had previously offered Plaintiffs' drug-to-diagnosis trade secrets for sale in the United States, Australia, South Africa, Canada, and Turkey, in the summer of 2021, when MedImpact first produced documents in M*edImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.).

113.   Plaintiffs could not reasonably have ascertained these facts any earlier, notwithstanding Dimensions' due diligence in pursuing claims in the Arbitration, and the service of discovery requests in M*edImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*, No. 3:19-cv-01865-GPC-DEB (S.D. Cal.), because of MedImpact's bad faith conduct in both cases.

114.   The statute of limitations should be tolled, pursuant to and without limitation, the discovery rule, equitable tolling, equitable estoppel, fraudulent concealment, and the continuing violation and continuous accrual doctrines.

115.   Notably, within three weeks of learning of MedImpact's ████████ ████████████████████████████████████████████████████████████ ███████████ Plaintiffs filed counterclaims relating to the drug-to-diagnosis edits against Defendants in *MedImpact Healthcare Systems, Inc. et al. v. IQVIA Inc. et al.*  Within one week of the Court denying the addition of the counterclaims to that case (because the deadline for amending the pleadings had passed), Plaintiffs filed their Complaint in this case.

116.   Plaintiffs' claims presented herein are timely.

## CLAIMS FOR RELIEF

## COUNT I

**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*)**

**Against All Defendants**

117.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

118.   Plaintiffs own and possess certain confidential, proprietary and trade secret information, through the acquisition of Dimensions, including Plaintiffs' custom logic and methods behind building and maintaining the logic that links between content and relational lists connecting drugs to diseases and conditions, including how an edit adjudicating engine works and the populated content within it, and validation of the edits, referred to herein as drug-to-diagnosis indication and contraindication edits, which constitute protectable trade secrets.

119.   This confidential, proprietary and trade secret information relates to products and/or services used in, and/or intended for use in, interstate or foreign commerce.

120.   Plaintiffs developed their confidential and proprietary drug-to-diagnosis indication and contraindication edits for thousands of medications, over years, through the dedicated work of numerous full-time employees, including pharmaceutical experts. Through their theft, Defendants bypassed years of research and development time, and avoided tens of millions of dollars in investment.

121.   Plaintiffs have taken substantial measures to keep such information secret and confidential.

122.   This confidential, proprietary and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

123.   In violation of Plaintiffs' rights, including following the enactment of the Defend Trade Secrets Act, Defendants have misappropriated Plaintiffs' trade secrets, in the various improper and unlawful ways as alleged herein, including by using, offering for sale and/or providing Plaintiffs' trade secrets to health authorities and/or clients in

FIRST AMENDED COMPLAINT

Australia, the United States, South Africa, Canada, Turkey, ███████████ ██████ and very likely other places (*e.g.*, China, Germany, Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom).  Defendants have derived actual economic value from their misappropriation and expect to continue to derive further value.

124.   Defendants gained access to Plaintiffs' trade secrets through the Joint Venture, under false pretenses.  Following execution of confidentiality agreements, Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis edits, through numerous emails, teleconferences, and in-person meetings.  In addition, over the term of the Joint Venture, Defendants received and recorded the results of millions of combinations of the drug-to-diagnosis indication and contraindication edits.  As a result, Defendants acquired Plaintiffs' confidential and proprietary logic and methods underlying the drug-to-diagnosis edits.

125.   Defendants' misappropriation of Plaintiffs' confidential, proprietary and trade secret information was intentional, knowing, and willful.

126.   Defendants have failed to return Plaintiffs' confidential, proprietary and trade secret information, and have attempted to conceal their theft and use of such information.  If this wrongful conduct is not remedied, and if Defendants are not enjoined, they will continue to misappropriate, disclose, and use for their own benefit, and to Plaintiffs' detriment, Plaintiffs' trade secret information.

127.   Plaintiffs have been harmed and will continue to be irreparably harmed by Defendants' violation of the Defend Trade Secrets Act.  Plaintiffs are entitled to damages, in an amount to be determined at trial, and affirmative actions to protect Plaintiffs' trade secret information, including a seizure of all documents or information in Defendants' possession concerning or relating to Plaintiffs' trade secret information, as well as an award of exemplary damages and attorneys' fees.

## COUNT II

48

1    **Misappropriation of Trade Secrets Under California Uniform Trade Secrets Act**

2    **Against All Defendants**

3    128.   Plaintiffs allege and incorporate the allegations of the preceding

4    paragraphs as if fully set forth herein.

5    129.   Plaintiffs own and possess certain confidential, proprietary and trade secret

6    information, through the acquisition of Dimensions, including Plaintiffs' custom logic

7    and methods behind building and maintaining the logic that links between content and

8    relational lists connecting drugs to diseases and conditions, including how an edit

9    adjudicating engine works and the populated content within it, and validation of the

10   edits, referred to herein as drug-to-diagnosis indication and contraindication edits,

11   which constitute protectable trade secrets.

12   130.   Plaintiffs developed the confidential and proprietary drug-to-diagnosis

13   indication and contraindication edits for thousands of medications, over years, through

14   the dedicated work of numerous full-time employees, including pharmaceutical experts.

15   Through their theft, Defendants bypassed years of research and development time, and

16   avoided tens of millions of dollars in investment.

17   131.   Plaintiffs have taken substantial measures to keep such information secret

18   and confidential.

19   132.   This confidential, proprietary and trade secret information derives

20   independent economic value from not being generally known to, and not being readily

21   ascertainable through proper means by another person who could obtain economic

22   value from the disclosure or use of the information.

23   133.   In violation of Plaintiffs' rights, Defendants have misappropriated

24   Plaintiffs' trade secrets, in the various improper and unlawful ways as alleged herein,

25   including by using, offering for sale and/or providing Plaintiffs' trade secrets to health

26   authorities and/or clients in Australia, the United States, South Africa, Canada, Turkey,

27   ███████████████████████  and very likely other places (*e.g.*, China, Germany,

28

FIRST AMENDED COMPLAINT

Ghana, India, Indonesia, New Zealand, Taiwan, Sweden, and/or the United Kingdom). Defendants have derived actual economic value from their misappropriation and expect to continue to derive further value.

134.   Defendants' misappropriation of Plaintiffs' confidential, proprietary and trade secret information was intentional, knowing, and willful.

135.   Defendants gained access to Plaintiffs' trade secrets through the Joint Venture, under false pretenses.  Following execution of confidentiality agreements, Defendants were provided confidential and proprietary information underlying the drug-to-diagnosis edits, through numerous emails, teleconferences, and in-person meetings.  In addition, over the term of the Joint Venture, Defendants received and recorded the results of millions of combinations of the drug-to-diagnosis indication and contraindication edits.  As a result, Defendants acquired Plaintiffs' confidential and proprietary logic and methods underlying the drug-to-diagnosis edits.

136.   Defendants have failed to return Plaintiffs' confidential, proprietary and trade secret information, and have attempted to conceal their theft and use of such information.  If this wrongful conduct is not remedied, and if Defendants are not enjoined, they will continue to misappropriate, disclose, and use for their own benefit, and to Plaintiffs' detriment, Plaintiffs' trade secret information.

137.   Plaintiffs have been harmed and will continue to be irreparably harmed by Defendants' violation of the California Uniform Trade Secrets Act.  Plaintiffs are entitled to damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

## COUNT III

### Racketeer Influenced And Corrupt Organizations Act (18 U.S.C. § 1962(c)) Against All Defendants

138.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

50

139.   Defendants qualify as "persons" under 18 U.S.C. § 1961(3).

140.   Defendants are members of an associated-in-fact "enterprise" under 18 U.S.C. § 1961(4) (the "MedImpact RICO Enterprise").  Throughout its existence, the MedImpact RICO Enterprise engaged in, and its activities affected, interstate commerce because it involved commercial activities across state lines.

141.   Each member of the MedImpact RICO Enterprise is separate and distinct from the Enterprise.

142.   Defendants each participated in the conduct of the affairs of the MedImpact RICO Enterprise because each had some part in directing those affairs.

143.   The MedImpact RICO Enterprise engaged in a pattern of racketeering activity under 18 U.S.C. § 1961(5).

144.   Defendants each violated 18 U.S.C. § 1962(c).  By violating 18 U.S.C. § 1962(c), the MedImpact RICO Enterprise caused concrete financial losses to the business and property of Plaintiffs.  Accordingly, Plaintiffs are "person[s] injured in his or her business or property" by reason of Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

145.   Defendants each engaged in, as well as aided and abetted, numerous predicate acts that constitute both a pattern of racketeering activity as well participation in the conduct of the affairs of the MedImpact RICO Enterprise.

146.   For example, each member of the MedImpact RICO Enterprise engaged in trade secret misappropriation in violation of the federal Defend Trade Secrets Act.  Such trade secret misappropriation is a RICO predicate.   18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1832, "relating to … theft of trade secrets").

147.   Each member of the MedImpact RICO Enterprise engaged in wire fraud, which is likewise a RICO predicate.  18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1343). Plaintiffs relied, to their detriment, on Defendants' misrepresentations and omissions. Defendants knowingly and intentionally made these misrepresentations and omissions.

FIRST AMENDED COMPLAINT

The Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions.  Defendants knew and intended that Plaintiffs would rely on these misrepresentations and omissions.

148.   Defendants had a duty to disclose to Plaintiffs, based on the relationship between them.  Plaintiffs worked with Defendants through the Joint Venture for years following the acquisition, during which time Defendants lured Plaintiffs into sharing their trade secrets with Defendants, based on materially false misrepresentations and omissions that Defendants sought the trade secrets for purposes of the Joint Venture. Defendant Dale Brown additionally owed Plaintiffs a duty to disclose as a Board Member and General Manager of the Joint Venture, with fiduciary duties to the Joint Venture and Plaintiffs.

149.   Defendants' materially false statements and omissions include:

a. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███ ████ ██████ ████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████ ██████ █ ██████████ ████ █ ███████
████████████████████ At no time did Defendants disclose that they were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets ██████████████████████
███████████████████████████████████████████

b. The drug-to-diagnosis indication and contraindication edits were regularly discussed at the Joint Venture's P&T meetings.  For example, the minutes of the first JV P&T meeting on April 24, 2012, attended by ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████ ████████████ ██ ███ ████████  as   provided   by Dimensions.  The drug-to-diagnosis indication and contraindication edits were further discussed at, at minimum, the following P&T meetings: May 23, 2012, attended by ██████████████████████; July 4, 2012, attended by ████████████████████ October 10, 2012, attended by ██████████ ████████████████████████████████████████████████████ ██████  February 13, 2013, attended by ███████████████████ ████████████████████████ December 17, 2014, attended by ████████ ██████████████████████████ and July 1, 2015, attended by ███ ██████████████████████  At no time during the P&T meetings or otherwise did Defendants disclose that Defendants were "partnering" with Dimensions to gain access to the drug-to-diagnosis trade secrets, or had misappropriated the drug-to-diagnosis trade secrets.

c. IQVIA AG acquired Dimensions in February 2016.    Following the acquisition, MedImpact, Dimensions, and/or IQVIA engaged in numerous communications—via email, teleconference, and in person—over the course of years.  For example, ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

FIRST AMENDED COMPLAINT

1    ████████████████████████████████████ participated in

2    Joint Venture Board meetings, including, without limitation:

3          i.   April 29, 2016 Joint Venture Board meeting attended by ████

4          ████████████████████████████████████████

5          ii.  August 22, 2016 Joint Venture Board meeting attended by ████

6          ████████████████████████████████████████

7          ████

8          iii. October 26, 2016 Joint Venture Board meeting attended by ████

9          ████████████████████████████████████████

10         ████

11         iv.  February 10, 2017 Joint Venture Board meeting attended by ████

12         ████████████████████████████████████████

13         v.   May 4, 2017 Joint Venture Board meeting attended by ████

14         ████████████████████████████████████████

15         ████ and

16         vi.  September 12, 2017 Joint Venture Board meeting attended by

17         ████████████████████████████████████████

18         ████████████████████████████████████████

19         ████████████████████████████

20   At no time during the Board meetings or otherwise did Defendants disclose

21   that they had misappropriated the drug-to-diagnosis trade secrets.

22   d.  ████████████████████████████████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

26   ████████████████████████████████ In

27

28

requesting access to Plaintiffs' trade secrets, Defendants did not disclose that they sought such access to misappropriate the same.

e.  In February 2018, Defendant Dale Brown advised Amit Sadana (IQVIA), Nitin Goel (IQVIA), Aravinda Tiwari (IQVIA), Yousef Ghosheh (Dimensions), Dr. Omar Ghosheh (Dimensions), James Gollaher (MedImpact U.S.), and Nancy Radtke (MedImpact U.S.), among others, that ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.  At no time did Defendants disclose that the drug-to-diagnosis edits in MedImpact U.S.'s PBM offering were misappropriated from Defendants and offered for sale to other clients.

f.  During a September 23, 2018 case management conference in the Arbitration, counsel for MedImpact argued that at paragraph 267 of the Statement of Defence & Counterclaim, ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ (emphasis added).

This statement by MedImpact counsel was, we now know, false when

made, because it was made *after* ███████████████████████████

████████████████████████████████████████████████████████████

████████

g.   On December 14, 2018, MedImpact submitted the Expert Report of

Heather Bates in the Arbitration, which falsely stated that (1) ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ and (2) ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████  ██████  ████████  ███████  █████  ███████████████  ████

████████████████████████████████████████████████████████████

█████████████   These statements were, as we also now know, false when

made, because they were made *after* ███████████████████████████

████████████████████████████████████████████████████████████

████████

h.   In a January 3, 2019 sworn witness statement submitted in the Arbitration,

Defendant Dale Brown falsely stated that ███████████████████████

████████████████████████████████████████████████████████████

██████████████████ (emphasis added).  This sworn statement was  also

false when made because, at the time this statement was made, ███████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

i.   In the same sworn statement, Brown stated that █████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

(emphasis added).  This sworn statement was false when made because, at

the   time   this   statement   was   made,   ████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████

j.   In  the  same  sworn  statement,  Brown  falsely  stated,  with  respect  to

MedBlocX, that ██████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████

k.   In their January 3, 2019 Reply and Defence to Dimensions' counterclaims

in  the  Arbitration,  MedImpact  International  and  MedImpact  Hong  Kong

█████████████████████████████████████████████

██████████████████████  This denial was also false when made, because it

was  made  *after*  ████████████████████████████████████

████████████████████████████████

57

l.  In the same Reply and Defence, MedImpact International and MedImpact Hong Kong falsely represented that ███████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████

m.  In the same Reply and Defence, MedImpact International and MedImpact Hong Kong falsely represented that ███████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████ This statement was false when made, because it was made *after* ████████████████████████████████████ ██████████████████████

n.  In MedImpact's February 11, 2019 Skeleton Argument, MedImpact falsely represented that ████████ ████████ ████████ █ ████████████████████████████████████ ████ ██████ ██ █ ██████ ██ ████████ █ ████████████████████████████████████ ███████████████ This statement was false when made, because it was made *after* █████████████████████████████████ ████████████████████████████

o.  In the same Skeleton Argument, MedImpact falsely represented that ████ ████████████████████████████████████ ██████████ This statement was false when made, because it was made

FIRST AMENDED COMPLAINT

*after* ███████████████████████████████████████

████████████████████████████████

p. In the same Skeleton Argument, MedImpact falsely represented that

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ This statement was false when made, because it was

made *after* ████████████████████████████████

███████████████████████████████████

q. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████   ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

FIRST AMENDED COMPLAINT

██████████████████████████████████████████████

████████    ██████████████    ████████████████████

████████████████████████████████    On August 14,

2019, Ghosheh provided sample indication and contraindication edits. ██

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████   (emphasis added).   Both Guttikonda and Dr. Mahmood followed up to request the indication and contraindication edits from Ghosheh, on November 21, 2019 and November 30, 2019, respectively. Ghosheh provided the indication and contraindication edits on December 20, 2019.  Plaintiffs provided these edits based on Defendants' *repeated* misrepresentations that they sought the information for the benefit of the Joint Venture's clients.  Defendants did not state the true reason they sought the edits—to offer such trade secrets for sale to other clients.

150.   In addition to these misrepresentations and omissions, Defendants, during the course of multi-year business relationships, sent numerous other communications to Plaintiffs, in the United States, by wire in furtherance of the scheme to defraud them.

151.   As is evidenced by the pattern of racketeering activity described herein, the members of the MedImpact RICO Enterprise are associated together for a common purpose, to unlawfully obtain Plaintiffs' trade secrets to unlawfully compete with the Joint Venture.  It is also clear from this pattern of racketeering activity that the MedImpact RICO Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities. There is a clear relationship among the members of the enterprise.  The enterprise has sufficient longevity to permit its members to pursue the enterprise's purpose.

152.   Each member of the MedImpact RICO Enterprise benefited from the common purpose of the scheme.

FIRST AMENDED COMPLAINT

153.   Defendants' conduct in furtherance of this scheme was intentional.

154.   Plaintiffs each suffered concrete domestic injuries to their businesses and property as a direct and proximate result of the pattern of racketeering activity engaged in by the MedImpact RICO Enterprise.  Plaintiffs suffered the following injuries, and more, because of the misappropriation of their trade secrets, and because they relied on Defendants' fraudulent misrepresentations and omissions.

155.   Defendants' unlawful use of Plaintiffs' trade secrets, including, without limitation, offering and/or providing Plaintiffs' trade secrets for sale to health authorities and/or clients in Australia, the United States, South Africa, Canada, Turkey, ██████████████████████████ constitutes unlawful competition against the Plaintiffs.  Plaintiffs, acting through Dimensions, license their drug-to-diagnosis trade secrets to health authorities, including in the Middle East, to facilitate the monitoring and/or regulation of fraud, waste, and abuse of prescription medications.  Defendants' unlawful use, offers to sell and/or sale of Plaintiffs' trade secrets erodes the prices of Plaintiffs' own offerings (through Dimensions) of the drug-to-diagnosis indication and contraindication edits.  Defendants' offers to sell and or/sale of Plaintiffs' trade secrets in the United States, Australia, South Africa, Canada, Turkey, █████████████ ███████ has, upon information and belief, further resulted in lost sales for Plaintiffs.

156.   Additionally, Defendants were required to obtain a license to Plaintiffs' drug-to-diagnosis indication and contraindication trade secrets, to use, offer for sale and/or sell such trade secrets, and Plaintiffs have been deprived of royalties from such license.

157.   Furthermore, the value of Plaintiffs' drug-to-diagnosis indication and contraindication edit trade secrets has been diluted by Defendants' misappropriation of those trade secrets and offers to provide those trade secrets around the world.

FIRST AMENDED COMPLAINT

158.   Moreover, Plaintiffs have been deprived of the benefit of their years-long investment of time and money into the development of these trade secrets, which were stolen by Defendants.

159.   Plaintiffs have also been deprived of the benefit of the bargain of their acquisition of Dimensions—including the trade secrets—by Defendants' theft of these trade secrets.   Plaintiffs paid more than they otherwise would have to acquire Dimensions, including its intellectual property, had Plaintiffs known of Defendants' theft of the drug-to-diagnosis indication and contraindication edits (which Defendants concealed).

160.   Under the provisions of 18 U.S.C. § 1964(c), Plaintiffs are entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.   Each Defendant is accordingly liable for three times Plaintiffs' actual damages to be determined at trial plus interest and attorneys' fees.

## COUNT IV

### Breach of Fiduciary Duty and Duty of Loyalty

### Against Dale Brown

161.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

162.   Plaintiffs' claim for breach of fiduciary duty and duty of loyalty stands separate and independent from their claims of trade secret misappropriation, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

163.   Defendant Dale Brown owed fiduciary obligations and duties of loyalty to the Joint Venture in his capacity as a Board Member and General Manager of the Joint Venture, and owed fiduciary obligations and duties of loyalty to Plaintiffs.   Brown was bound by his fiduciary obligations and duty of undivided loyalty to act in the best interests of the Joint Venture and Plaintiffs.

62

164.   Brown breached his fiduciary obligations and duties of loyalty to the Joint Venture and Plaintiffs by misusing Plaintiffs' confidential information in violation of confidentiality agreements; partnering with Dimensions under false pretenses; directly participating in making materially false and/or misleading statements to Plaintiffs about the purpose of the Joint Venture (concealing Defendants' fraudulent scheme from Plaintiffs); misusing Plaintiffs' confidential information; diverting opportunities away from the Joint Venture; and serving MedImpact's ulterior motives and engaging in self-dealing.

165.   Brown's breach of his fiduciary obligations and duties of undivided loyalty to the Joint Venture and Plaintiffs, by acting adversely to the interests of the Joint Venture and Plaintiffs, was a substantial factor in causing significant harm to Plaintiffs.

166.   As the proximate result of Brown's breach of his fiduciary duties and duties of undivided loyalty, Plaintiffs have suffered significant damage in an amount to be determined at trial.  Additionally, because Brown acted with malice, Plaintiffs seek exemplary and/or punitive damages.

## **COUNT V**

### **Civil Conspiracy**

### **Against Dale Brown**

167.   Plaintiffs allege and incorporate the allegations of the preceding paragraphs as if fully set forth herein.

168.   Plaintiffs' claim for civil conspiracy stands separate and independent from their claims of trade secret misappropriation, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

169.   Defendant Dale Brown knowingly and willfully conspired and agreed with MedImpact to partner with Dimensions under false pretenses; misuse Plaintiffs' confidential information; divert opportunities away from the Joint Venture; and make materially false and/or misleading statements to Plaintiffs about the purpose of the Joint

FIRST AMENDED COMPLAINT

Venture (concealing Defendants' fraudulent scheme from Plaintiffs).  Brown furthered the conspiracy by pursuing the partnership with Dimensions to serve the ulterior motives of MedImpact; concealing his ulterior motives from Plaintiffs; misusing Plaintiffs' confidential information; and diverting opportunities away from the Joint Venture.

170.   Brown committed the wrongful acts herein alleged pursuant to, and in furtherance of, this conspiracy and agreement.

171.   As a proximate result of the wrongful acts alleged herein, Plaintiffs have suffered and will continue to suffer significant damages in an amount to be determined at trial.   Defendants are jointly and severally liable to Plaintiffs, and Plaintiffs are entitled to punitive damages against them.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment against Defendants as follows, and hold them jointly and severally liable:

(i)     Judgment in Plaintiffs' favor against Defendants on all claims alleged herein;

(ii)    A preliminary and permanent injunction to enjoin Defendants, and their agents, servants, employees, attorneys, successors, and assigns, and all persons, firms, and corporations acting in concert with them, from further misappropriation or use of Plaintiffs' trade secrets;

(iii)   Order Defendants to pay compensatory damages in an amount to be determined at trial;

(iv)    Order Defendants to pay consequential and actual damages or disgorgement of profits unjustly obtained in an amount to be determined at trial;

(v)   Order Defendants to pay punitive and exemplary damages, including but not limited to punitive and exemplary damages for Defendants' willful and malicious misappropriation of Plaintiffs' trade secrets;

(vi)   Order Defendants to pay reasonable attorneys' fees and allowable costs and expenses; and

(vii)   Order all other such relief the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

172.   Pursuant to Rule 38 of the Federal Rules of Civil Procedures, Plaintiffs hereby demand a trial by jury.

[*Signature Page Follows*]

65

FIRST AMENDED COMPLAINT

Dated: May 6, 2022

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

STEPHEN A. SWEDLOW*
JOSEPH C. SARLES
MICHELLE SCHMIT*

Attorneys for Plaintiffs IQVIA INC.,
IQVIA AG, and DIMENSIONS
HEALTHCARE LLC

*Admitted pro hac vice


[ADDITIONAL COUNSEL]

Callie A. Bjurstrom (SBN 137816)
callie.bjurstrom@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
501 West Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone: 619.544.3107
Facsimile:  619.236.1995

Kenneth W. Taber (admitted pro hac vice)
kenneth.taber@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Telephone: 212.858.1813
Facsimile:  212.298.8405

Michael J. Finnegan (SBN 137409)
mfinnegan@pillsburylaw.com
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
Telephone:  213.488.7272
Facsimile:  213.629.1033

66

FIRST AMENDED COMPLAINT